THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PERCY MYRICK, Defendant-Appellant.

First District (3rd Division)   No. 1—92—3009

Opinion filed May 31, 1995.—Rehearing denied August 8, 1995.

Dennis Doherty, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and James Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Defendant, Percy "Face" Myrick, was found guilty of first degree murder in a bench trial and was sentenced to 45 years in prison. Defendant contends that: (1) he was not proven guilty of first degree murder beyond a reasonable doubt because the evidence was insufficient to show he knew his actions would cause death or great bodily harm; and (2) the State failed to prove probable cause to seize him at the time he was seized. We affirm defendant's conviction.

On June 25, 1991, Daphne Townsend left her six-month-old baby, Oasby Gilliam, to go to work. Around the same time, Catherine Taylor, her roommate, went out with her children. Daphne's boyfriend, "T," was left in charge of baby Oasby. "T," however, left around 9:30 a.m. to visit his aunt. The only person left with baby Oasby was defendant, Catherine's boyfriend of three weeks.

Michelle Adams went into the apartment around 10:45 a.m. and found baby Oasby, unattended, lying on the floor, and foaming at the mouth. She immediately called for assistance. The baby was pronounced dead at the hospital. An autopsy of baby Oasby revealed two adjacent skull fractures, two broken ribs, laceration to the liver, and hemorrhaging of the intestines and of the back. The baby died of multiple injuries due to blunt trauma.

According to defendant's statement to the police, he was in bed

watching television when he heard the baby crying. Defendant then realized he was alone with the baby and went to get the baby's bottle. He was angry at the other adults for leaving him alone with the baby. He picked up baby Oasby and shook him in an up and down motion "trying to hush him." While turning with the baby in his arms, the baby's head hit the wall. The baby screamed loudly so defendant rubbed the baby's head and kissed him. When the baby started coughing, defendant hit him in the back a few times. Baby Oasby threw up and defendant tapped the baby on the chest with his open hand. When the baby did not stop crying, defendant "gently tossed" the baby to the bed across the room. At the time he tossed the baby, defendant was closer to baby Oasby's crib than to the bed. The baby hit the side of the bed, fell off the bed, and his head hit the floor. Defendant picked up the baby, shook him, and tapped him on the head, then he laid the baby down, which caused the baby's head to have "gently tapped the floor." The baby had his eyes and mouth open and just lay on the floor. Being nervous, defendant put milk in the bottle, set it down, and left the apartment to buy heroin.

■ On appeal, defendant's first contention is that the State did not prove beyond a reasonable doubt that he knew his acts would cause death or great bodily harm. In Illinois, "[a] person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death *** he knows that such acts create a strong probability of death or great bodily harm to that individual." (720 ILCS 5/9—1(a)(2) (West 1992).) In reviewing whether defendant was proven guilty beyond a reasonable doubt, the "question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *People v. Eyler* (1989), 133 Ill. 2d 173, 191, 549 N.E.2d 268.

At the time, defendant was a 21-year-old, 215-pound, 6-foot-tall male. Baby Oasby was six months old, weighed 14 pounds, and was 25 inches tall. The disparity in size between defendant and the victim is evident. A six-month-old baby is very fragile. Shaking a baby so violently that it causes internal bleeding and breaks two ribs is not the best way to "hush" a baby. It was not unreasonable for the trier of fact to find that when defendant was shaking the baby and throwing him across the room, he knew such acts created a strong probability of death or great bodily harm.

■ Although defendant said that Oasby's head accidentally hit the wall as he was turning him in his arms and that he "gently tossed" the baby to the bed across the room, the trier of fact need not

believe those portions of his statement. The trier of fact may accept all, part, or none of a defendant's confession. (*People v. Garza* (1981), 92 Ill. App. 3d 723, 729, 415 N.E.2d 1328, 1334.) The trier of fact does not have to believe the self-serving characterization of a defendant's actions.

The autopsy revealed baby Oasby's skull was fractured in two places. At trial, Dr. Konacki testified that he expected these two fractures to occur with more than just one blow. The trier of fact may consider any discrepancies between the confession and the evidence adduced at trial in assessing the degree of credibility to afford the confession. (*People v. Hester* (1968), 39 Ill. 2d 489, 511-12, 237 N.E.2d 466, 480.) The trial court could take into account the discrepancies between defendant's statement that the baby's head accidentally hit the wall only one time and the doctor's testimony that he thought the fractures were caused by more than one blow. Furthermore, defendant's statement that he "gently tossed" the baby to the bed on the other side of the room can be weighed against the fact that defendant was closer to the crib than to the bed. In fact, the baby's crib was next to where defendant was standing.

■ Although Dr. Konacki testified on cross-examination that the bruise on the chest and hemorrhaging of the heart could have been caused by an effort at resuscitation, this was mere speculation. Nowhere in defendant's statement does he say he was trying to resuscitate baby Oasby. On the contrary, defendant admitted he left the unresponsive baby alone on the floor without calling for assistance. Instead of calling the paramedics or the police, defendant callously went to buy heroin, leaving the injured baby alone. After taking into consideration the discrepancies between the evidence and the defendant's statement, the trial court could reasonably assess little or no credibility to defendant's statements of concern for the baby.

The State has the burden of proving the defendant guilty beyond a reasonable doubt, not beyond any possible doubt. (*People v. Madej* (1985), 106 Ill. 2d 201, 218, 478 N.E.2d 392, 399.) A trier of fact could reasonably infer that defendant was responsible for the conduct which caused baby Oasby's death and that defendant was aware his actions created a strong probability of great bodily harm or death. We conclude the evidence was sufficient to prove defendant guilty of first degree murder beyond a reasonable doubt.

Defendant's second contention is that the State failed to prove probable cause to seize him at the time he was seized. Defendant's motion to quash arrest and suppress evidence was denied and defendant contends on appeal that the motion should have been allowed

and, therefore, all fruits of the illegal arrest, including defendant's incriminating station-house statement, be suppressed.

At a hearing on a motion to quash arrest and suppress evidence, the State's witnesses testified to the following. On June 26, 1991, Detective Chambers and her partner were assigned the investigation of baby Oasby's death. Dr. Konacki told them the baby had been murdered the previous day. "T" told the detectives that Oasby was his girlfriend's baby and when he left to visit his aunt, the baby was asleep in the apartment. Furthermore, defendant was the only other person in the apartment. The detectives talked to "T"'s aunt, who corroborated that "T" had come to her home at 9:30 a.m. An individual known as "38" said he knew where the defendant hung out and would take the detectives there.

The detectives went with "38" to a park but did not see defendant so they kept driving around the neighborhood. Around 8 p.m., they were by the park when "38" told the detectives that defendant was driving behind their unmarked police car. When defendant turned into a gas station, the detectives activated their oscillating headlights and pulled up behind him. Detective Chambers and her partner exited their car with their guns drawn and approached defendant's car.[1] Defendant had exited his car and was asked to put his hands on the car, which he did. Seeing no weapons, the detectives put their guns away. Defendant acknowledged that he was "Face." Detective Chambers told him that she needed to speak to him regarding the death of Oasby Gilliam. When defendant asked if he could give his car keys to a friend, the detective said he could. One of defendant's friends approached and got defendant's car keys. Defendant was not handcuffed when he got into the police car. The detectives drove "Face" to the police station and placed him in an interview room. He was not handcuffed in the interview room.

At that point, the detectives briefly interviewed other witnesses at the station. Daphne Townsend and Catherine Taylor said they had left the apartment around 9 a.m. and at that time "T," defendant and baby Oasby were in the apartment. A neighbor saw "T" leave the apartment around 10 a.m. Another neighbor saw defendant leave the apartment around 11 a.m. After talking to the other witnesses, Detective Chambers went to defendant's interview room and advised him of his *Miranda* rights. After talking with defendant for an hour, Detective Chambers called Assistant State's Attorney John Kirby. Mr. Kirby came to the station and talked to defendant. That is when defendant gave a court-reported statement incriminating himself.

---

[1]Detective Pavon was also present at the gas station but it is unclear from the record what his actions were.

Defendant testified at the hearing that he was at the gas station when the detectives came in an unmarked car, pulled out their guns, lifted his shirt, said he was the guy, and handcuffed him. They did not tell him he was under arrest or show him a warrant. He was not told that they wanted to interview him about the death of baby Oasby until after he was in the police car. Defendant called his friends who were nearby to take his car. On cross-examination, defendant said he knew they were officers and he never told them he did not want to go to the police station.

Pleasure Singleton, who took defendant's car keys that night, also testified at the hearing. He was at the park with friends when he ran to the gas station. He saw the detectives putting defendant, handcuffed, into the police car. Defendant told him to run home and tell his mother that the police had him. On cross-examination, the witness said he and defendant were both members of the "Four Corner Hustlers" street gang and he would do anything to help out a fellow gang member.

■ A person is seized when, by means of physical force or show of authority, his freedom of movement is restrained such that a reasonable person, innocent of any crime, would believe he is not free to leave. (*People v. Wipfler* (1977), 68 Ill. 2d 158, 166, 368 N.E.2d 870, 873; *People v. Wicks* (1992), 236 Ill. App. 3d 97, 104, 603 N.E.2d 594, 598.) A court should view all the circumstances surrounding the incident to determine whether a reasonable person would believe a seizure occurred. (*Wicks*, 236 Ill. App. 3d at 104, 603 N.E.2d at 598.) Factors to consider when determining whether a person was seized are: the threatening presence of several officers; display of weapons; physical touching; tone of voice indicating compliance with arrest might be compelled; and formal declaration of arrest or routine practices associated with arrest such as searching, booking, handcuffing, fingerprinting and photographing. (*Wicks*, 236 Ill. App. 3d at 104, 603 N.E.2d at 598.) The test is flexible in that it does not focus on any one action taken by the police but rather focuses on the totality of the circumstances that led to a coercive effect by the police. *Wicks*, 236 Ill. App. 3d at 104, 603 N.E.2d at 598.

■ The trial court found that defendant, as a good citizen cooperating in an investigation, went voluntarily to the police station. Where consent to accompany and cooperate with police officers is at issue, such consent is a factual matter to be determined by the trial court, and this determination will not be reversed unless clearly unreasonable. (*People v. DeHoyos* (1988), 172 Ill. App. 3d 1087, 1093, 527 N.E.2d 319, 323.) The trial court did not believe defendant's and Pleasure Singleton's testimony that defendant was handcuffed at the

gas station. The trial court is in a better position to judge the credibility of witnesses than is the appellate court because we cannot observe the witnesses' demeanor to help us decide what weight to give their testimony. (See *People v. Morgan* (1986), 112 Ill. 2d 111, 136, 492 N.E.2d 1303, 1313.) Given the facts of this case, we cannot say that the trial court's determination was clearly erroneous. The trial court further found that when the investigation at the police station continued there was probable cause to arrest the defendant. A reviewing court will not disturb a trial court's finding on a motion to quash arrest and suppress evidence unless that finding is manifestly erroneous. *People v. Reynolds* (1983), 94 Ill. 2d 160, 165, 445 N.E.2d 766, 769.

We are not unmindful that the events before defendant's stationhouse statement "look" like an arrest. The detectives went up to defendant with their guns drawn, drove him to the station in a police car, and questioned him after informing him of his *Miranda* rights. Although Detective Chambers and her partner had their guns drawn at the gas station, they immediately holstered them after perceiving there was no danger. Only two officers went up to defendant in an area across the street from the park where defendant's friends were hanging out. Two officers in an area near friends are not unduly threatening in such a manner as to make a request to accompany them to the police station coercive. Furthermore, there was no evidence that the officers' tone of voice indicated compliance with their request to come to the station would be compelled.

The fact that defendant did not drive his own car to the police station does not indicate that he was arrested at the gas station. A police officer can drive a person to the police station for a consensual interview. When the police ask a person innocent of any wrongdoing to accompany them to the station for questioning, that person would believe he is free to leave. If we were to say as a matter of law that a reasonable person would not feel free to leave because an officer is driving that person to the station, then an officer could never drive anyone to the station to be interviewed unless there was probable cause to arrest that person. This would not be good policy.

Defendant knew the officers wanted to talk to him about what had happened to baby Oasby. He never said he did not want to go to the station. Defendant never asked the detectives if he could drive his own car to the station. Instead, defendant asked if he could give his car keys to a friend. Every citizen has a duty to cooperate with the police up to the point of self-incrimination. (*People v. Johnson* (1989), 187 Ill. App. 3d 756, 769-70, 544 N.E.2d 392, 400.) There was no credible evidence of a formal declaration of arrest. Defendant was

not searched, handcuffed, fingerprinted, or photographed. After reviewing the evidence, we conclude that defendant voluntarily accompanied the detectives to the station.

Defendant was not arrested until after being interviewed at the police station. Probable cause exists where the police have knowledge of facts which would lead a reasonable person to believe that a crime has occurred and that it has been committed by defendant. (*People v. Foster* (1987), 119 Ill. 2d 69, 83, 518 N.E.2d 82, 87.) Defendant cites *People v. Dace* (1987), 153 Ill. App. 3d 891, 899, 506 N.E.2d 332, 337, to argue that the police did not have probable cause to arrest him. In *Dace*, the court held that being the last person seen with the murder victim is not, by itself, sufficient to constitute probable cause to arrest. (*Dace*, 153 Ill. App. 3d at 899, 506 N.E.2d at 337.) Unlike *Dace*, defendant was not arrested solely because he was the last person seen with the victim. In addition to having several witnesses pinpoint defendant as the last person with baby Oasby, the police had his inculpatory statement.

The trial court's finding that defendant voluntarily accompanied the detectives to the police station is not clearly unreasonable. Defendant was not arrested until after his inculpatory statement and at that time there was probable cause for his arrest. In viewing the police conduct as a whole, the record supports the trial court's denial of the motion to quash arrest and suppress evidence.

Therefore, we affirm the judgment of the trial court.

Affirmed.

GREIMAN, P.J., and TULLY, J., concur.