THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICAH ANDERSON, Defendant-Appellant.

First District (1st Division)   No. 1—06—1118

Opinion filed September 28, 2009.

HALL, J., dissenting.

Edwin A. Burnette, Public Defender, of Chicago (Pamela M. Leeming, Assistant Public Defender, of counsel), for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (James E. Fitzgerald, Mary P. Needham, and Margaret M. Smith, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GARCIA delivered the opinion of the court:

The defendant, Micah Anderson, appeals from his conviction for the first degree murder of Kenji Robinson. A jury found the defendant accountable for the November 13, 2003, shooting death of Robinson. Judge James Linn sentenced the defendant to 24 years' imprisonment. The defendant argues that Judge Linn erred in denying his motion to quash his arrest and in allowing testimony that permitted the jury to draw the inference that he failed a polygraph examination before making an inculpatory statement. Because the defendant was not seized until after he admitted his role in Robinson's shooting and was not prejudiced by the admission of testimony that he was interviewed by a "forensic investigator," we affirm.

## BACKGROUND

### Motion to Quash Arrest

The defendant filed a pretrial motion to quash his arrest, arguing that he was seized without an arrest warrant or probable cause and that his inculpatory statement should be suppressed as the fruit of an illegal seizure. Codefendant Mahendra Anderson, the defendant's brother, also filed a motion to quash his arrest; Judge Linn conducted a joint hearing on the two motions.

At the hearing, Detective Bor, the only witness that testified in the defendant's motion, was assigned on November 14, 2003, to investigate the previous night's shooting death of Robinson. Detective Andras, who previously led the investigation, informed Detective Bor that at approximately 11 p.m. on November 13, 2003, witnesses heard three gunshots in the alley at 3548 West Cermak, then saw a gray car and a red Pontiac speeding from the alley where Robinson's body was discovered. Detective Andras also informed Detective Bor that Robinson owned a red Pontiac and was friends with the defendant and the defendant's brother Mahendra. Witnesses saw Robinson's red Pontiac on the street near the Mt. Sinai Hospital in the early morning of November 14, 2003. Although he was unable to determine who drove the Pontiac to the hospital, Detective Andras learned that Mahendra was being treated there for a gunshot wound to his hand. Detective Andras interviewed Mahendra, who said he was shot by two unknown persons in an alley between Ridgeway and Hamlin off Douglas Boulevard in Chicago. When Detective Andras asked Mahendra about the clothing he wore when he was shot, Mahendra said he asked the defendant to take it home from the hospital.

After receiving this background from Detective Andras, Detective Bor interviewed Torrance Sanders, who claimed to have information about Robinson's death. Sanders stated that on November 13, 2003, he and Ruben Brandon drove Brandon's car to an alley where they met the defendant and Robinson. A mechanic was repairing Robinson's Pontiac in the alley. Once the repair was complete, the defendant and Sanders left the alley in the Pontiac, picked up Mahendra, and dropped Sanders off at a liquor store. Later in the evening, Sanders was near the alley at 3548 West Cermak when he saw police cars and noticed Brandon walking down the street. Brandon told Sanders that Robinson was dead. Brandon instructed Sanders not to tell authorities that he had been with Robinson earlier that day.

Detective Bor also interviewed Latoya Johnson, Robinson's wife. Ms. Johnson stated that shortly after the murder the defendant told one of her family members that he had last seen Robinson in an alley, near Brandon and Brandon's car. She also spoke with Mahendra on November 14. Mahendra said he last saw Robinson the previous night drinking in an alley with unknown persons near Brandon's car. Mahendra also told her that the defendant had the keys to Robinson's Pontiac.

Detective Bor testified that he and his partner drove to the defendant's house at approximately 2 p.m. on November 14, 2003, to interview him. The defendant was sitting alone on his front porch. Detective Bor introduced himself as a police officer and asked if the

defendant had the keys to Robinson's car and Mahendra's bloody clothes. The defendant said he had them and gave both to the officers. Detective Bor then asked the defendant to come to Area Four for an interview; the defendant agreed. Prior to the defendant entering the police car, Detective Bor "patted him down," but did not handcuff him. The defendant rode in the backseat of Detective Bor's unmarked car. They arrived at Area Four at approximately 2:30 p.m.; Detective Bor led the defendant to an interview room with a desk to take notes and talk. The room had no window or bathroom. According to Detective Bor, the door was closed, but not locked. Detective Bor did not handcuff the defendant in that room. However, he told the defendant "to stay there" until Detective Bor and his partner returned.

While the defendant waited in the interview room, Detective Bor went to Mt. Sinai Hospital and interviewed Mahendra, who said he was shot while walking to a liquor store by two unknown persons in an attempted robbery. After being shot, Mahendra called his friend Johnny Powell, who picked him up and took him to the hospital.

Detective Bor testified that he returned to Area Four at approximately 4 p.m. to interview the defendant once again. Detective Bor read the defendant his *Miranda* rights. The defendant said he was willing to speak with the police officers and revealed the following details about his whereabouts during the evening of November 13, 2003.

The defendant stated that Robinson picked him up in his Pontiac the morning of November 13, 2003, and they drove to an alley to have the brakes repaired. Brandon then arrived in his car, and all three went for a ride in Brandon's car. When they returned to the alley, Robinson's Pontiac was repaired. The defendant drove the Pontiac to a gas station and picked up his brother Mahendra. As the two drove in the area of 16th Street and Central Park, they saw Brandon parked on the street, and he signaled for them to follow him. They followed Brandon's car into an alley between Ridgeway and Hamlin off Douglas Boulevard, where Brandon and another unknown person got out of the car.

The defendant asked Brandon where Robinson was, and Brandon responded, "[h]e's gone." The unknown person then pointed a handgun at Mahendra and began firing. Mahendra ran from the alley, but was shot in the hand. The defendant sped from the alley in the Pontiac while Brandon and the unknown shooter left the alley in Brandon's car in the opposite direction.

After unsuccessfully searching for Mahendra, the defendant drove to the house of another friend, Darryl Lee. A few minutes later, Brandon arrived at Lee's home. Brandon and the defendant discussed

the shooting, and the conflict "was somehow settled." The defendant then learned that his brother was at Mt. Sinai hospital. He drove the Pontiac to the hospital and parked the car on the street. Mahendra asked the defendant to take his clothes home because there was money inside. Detective Bor testified that he ended the interview at that point and left Area Four, along with his partner, to locate Johnny Powell and Darryl Lee in an effort to corroborate the defendant's statements.

Between 1:30 and 4 a.m. on November 15, 2003, Detective Bor interviewed the defendant again. Detective Bor testified that after he informed the defendant that he had spoken with Sanders, Powell, and Lee, the defendant "changed his story somewhat." Detective Bor then asked the defendant whether he would be willing to take a polygraph examination later that morning; the defendant agreed.

At approximately 11 a.m., Detective Bor took the defendant to the police department's "Homan Square Facility" for a polygraph examination. Forensic Detective Howley administered the examination and told the defendant and Detective Bor that the defendant failed. Detective Bor took the defendant back to Area Four at approximately 1:30 p.m.

Detective Bor testified that he interviewed the defendant again at approximately 4:30 p.m. that same afternoon. He first told the defendant the results of the polygraph examination. According to Detective Bor's testimony, the defendant then admitted that earlier in the day on November 13, 2003, he traveled to a liquor store with Sanders and Brandon, who was a high-ranking member of the Insane Vicelords gang. Brandon told the defendant that Robinson "has got to get," which he understood to mean that Robinson was going to be killed. The defendant later drove Robinson's Pontiac to pick up Mahendra, and the two met Brandon and Robinson in the alley behind 3548 West Cermak. When the defendant and Mahendra got out of the Pontiac, Brandon told them to "arrest" Robinson, meaning that they should hold him so he could not run. As the brothers held Robinson, Brandon told Robinson that he had to answer for the shooting death of David Scott several months earlier, in which Brandon believed Robinson was involved. Brandon then recited a "gang statement of love," removed a revolver from his clothing, and shot Robinson three times. In shooting Robinson, Brandon accidentally shot Mahendra in the hand, causing Mahendra to run from the alley. The defendant met up with Brandon later in the night, and Brandon told him not to tell anyone what happened. When the defendant visited Mahendra at the hospital, he instructed Mahendra to tell authorities that he was shot in an alley between Ridgeway and Hamlin off Douglas.

Detective Bor testified that after the defendant made the inculpatory statements, he formally placed the defendant under arrest. During the early evening of the following day, November 16, 2003, the defendant was interviewed by Assistant State's Attorney (ASA) James Papa. ASA Papa prepared a handwritten statement based upon the interview, which the defendant reviewed and signed.

After hearing the above evidence, Judge Linn denied the defendant's motion to quash his arrest. Judge Linn found Detective Bor to be a credible witness. Noting that the defendant had Robinson's car keys and his brother's bloody clothes, Judge Linn found that the police were engaging in a legitimate investigation while he was at Area Four and were not on a "lark" in pursuit of further evidence. "[L]ooking at the totality of all circumstances and the nature of the encounter," Judge Linn found "that the Fourth Amendment was not violated by [the police] encounters with [the defendant]."

### Trial

The defendant's case proceeded to a jury trial, which was conducted simultaneously with Mahendra's bench trial. In opening statements, defense counsel noted that police officers first placed the defendant in a small, windowless interview room with a closed door and no toilet, water, or bed at 2:30 p.m. on November 14, 2003. Defense counsel also stated that the defendant did not sign a statement until 53 hours later and that the statement was prepared by a prosecutor before the defendant reviewed it.

The trial evidence was substantially similar to that introduced at the motion to quash arrest. Torrance Sanders and Latoya Johnson testified consistently with their statements to Detective Bor introduced at the motion to quash arrest.

Detective Bor testified to the same series of events leading up to his interview with the defendant between 1:30 and 4 a.m. on November 15, 2003. Detective Bor testified that after that interview he asked if the defendant "would be willing to be interviewed by a forensic investigator who works in another unit," and the defendant said he would. Detective Bor described the Homan Square facility where that interview took place as the location of "the forensics division, narcotics division, [and] vice division." According to his testimony, Detective Bor called a "Detective" in the forensics unit to schedule the interview, then took the defendant to the Homan Square facility at approximately 11 a.m. on November 15, 2003. Detective Bor testified that Detective Howley, a "forensic investigator," conducted the interview of the defendant.

When the prosecutor asked Detective Bor if he learned the results of that interview, defense counsel objected and asked for a sidebar. The parties later recounted the details of the sidebar outside the presence of the jury after Detective Bor finished testifying. At the sidebar, the prosecutor revealed how she planned to question Detective Bor about the polygraph examination, which Judge Linn ruled "would not cause any unfair prejudice to" the defendant. Judge Linn noted that "[t]he word polygraph never came out of anybody's mouth, nor the fact he flunked any test." Defense counsel argued that although the prosecutor did not use the word "polygraph," "the inference is there." Judge Linn commented to defense counsel that he "made quite a bit of talk in your opening statement and in your cross-examination about the fact it was only after a long period of time he came up with an inculpatory statement." Because it was "handled properly," Judge Linn found the questioning proper.

After the sidebar, Detective Bor testified that he "discuss[ed] with Detective Howley the course of his interview with the defendant." Detective Bor then transported the defendant back to Area Four and interviewed him again at 5 p.m. on November 15, 2003. Over defense counsel's objection, Detective Bor testified that he discussed with the defendant his interview with Detective Howley, "the forensic guy." Detective Bor testified that after that discussion the defendant admitted his part in the murder and was placed under formal arrest.

ASA Papa testified that he handwrote a statement based on his interview of the defendant, which the defendant reviewed and signed. That statement was read into evidence. It corroborated the version of events described in Detective Bor's testimony at the pretrial motion and at trial.

The jury convicted the defendant of first degree murder. This timely appeal followed.

## ANALYSIS

### Motion to Quash Arrest

The defendant first contends that Judge Linn erred in denying his motion to quash his arrest because he was seized without a warrant or probable cause at some point after his overnight stay at Area Four on November 14, 2003, but before his inculpatory statement.

"In reviewing a trial court's ruling on motions to quash arrest or suppress evidence, the appellate court defers to the court's factual findings unless they are against the manifest weight of the evidence." *People v. Jones*, 374 Ill. App. 3d 566, 573, 871 N.E.2d 823 (2007), citing *People v. Sorenson*, 196 Ill. 2d 425, 430-31, 752 N.E.2d 1078 (2001). However, "we review the legal questions of probable cause and the

suppression of evidence *de novo.*" *Jones,* 374 Ill. App. 3d at 573, citing *Sorenson,* 196 Ill. 2d at 431.

Both the United States Constitution and the Illinois Constitution of 1970 protect persons from unreasonable searches and seizures. *People v. Cosby,* 231 Ill. 2d 262, 273, 898 N.E.2d 603 (2008), citing U.S. Const., amend. IV; Ill. Const. 1970, art. I, §6. A person is seized for fourth amendment purposes when, "by means of physical force or show of authority, his or her freedom of movement is restrained." *People v. Sturgess,* 364 Ill. App. 3d 107, 113, 845 N.E.2d 741 (2006). To determine whether a seizure has occurred, courts consider whether, " 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *Cosby,* 231 Ill. 2d at 274, quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877 (1980).

"Factors Illinois courts consider in determining whether a defendant was arrested include: (1) the time, place, length, mood, and mode of the encounter between the defendant and the police; (2) the number of police officers present; (3) any indicia of formal arrest or restraint, such as the use of handcuffs or drawing of guns; (4) the intention of the officers; (5) the subjective belief or understanding of the defendant; (6) whether the defendant was told he could refuse to accompany the police; (7) whether the defendant was transported in a police car; (8) whether the defendant was told he was free to leave; (9) whether the defendant was told he was under arrest; and (10) the language used by officers. [Citations.]" *People v. Washington,* 363 Ill. App. 3d 13, 24, 842 N.E.2d 1193 (2006). "Courts must examine the totality of circumstances to determine whether an arrest has been made." *People v. Prince,* 288 Ill. App. 3d 265, 273, 681 N.E.2d 521 (1997).

That officers read a defendant his *Miranda* rights "could indicate to a reasonable person that he was in custody on suspicion of criminal activity." *People v. Townes,* 91 Ill. 2d 32, 37, 435 N.E.2d 103 (1982). A defendant that voluntarily accompanies the police to the station for questioning does not implicitly consent to remain there while the police investigate in search of probable cause for an arrest. *People v. Barlow,* 273 Ill. App. 3d 943, 950, 654 N.E.2d 223 (1995). Although courts consider the length of an interrogation in determining whether a defendant was seized, a long time spent in the interview room "does not conclusively establish whether [a] defendant was illegally detained at the police station." *Prince,* 288 Ill. App. 3d at 273 (finding that the defendant was not seized after remaining at the police station overnight), citing *People v. Perez,* 225 Ill. App. 3d 54, 65, 587 N.E.2d 501 (1992).

Based on the testimony of Detective Bor, whom the trial court found credible, the police had probable cause to arrest the defendant when he admitted his role in the shooting, at approximately 5 p.m. on November 15, 2003. *People v. Jackson*, 232 Ill. 2d 246, 275, 903 N.E.2d 388 (2009) (where facts known to officers would lead a reasonably cautious person to believe the defendant committed a crime, probable cause exists). The parties, however, dispute when the defendant was seized: the State principally argues that the defendant was not seized until his formal arrest[1]; the defendant contends that his voluntary presence at the police station transformed into an unlawful seizure at some point before his inculpatory statement to the police on November 15, 2003, which he does not dispute established probable cause for his arrest.

As noted, the defendant does not now contest that he voluntarily accompanied officers to Area Four on November 14, 2003. When Detective Bor and his partner first encountered the defendant on the porch outside his home, they did not display a weapon or use language that was threatening or suggested compliance was mandatory. *Cosby*, 231 Ill. 2d at 274, quoting *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877. The defendant willingly gave up Robinson's car keys and his brother Mahendra's bloody clothes and agreed to accompany the officers to Area Four.

Nor do we find indicia of a seizure at the time the defendant arrived at Area Four. Although Detective Bor read the defendant his *Miranda* rights before first interviewing him at Area Four, "where a defendant voluntarily accompanies an officer to the police station, there is no formal declaration of arrest, and the defendant is not searched, handcuffed, fingerprinted, or photographed, the defendant is neither seized nor under arrest." *Sturgess*, 364 Ill. App. 3d at 113, citing *People v. Myrick*, 274 Ill. App. 3d 983, 989-90, 651 N.E.2d 637 (1995). The defendant does not deny that the factors noted in *Sturgess* are present in his case: no formal declaration of arrest occurred when he arrived at Area Four; nor was the defendant handcuffed, fingerprinted, or photographed. Absent authority to the contrary, that the

---

[1]The State's initial position is that the circuit court found probable cause to arrest present at the time Detective Bor "encountered the defendant at his residence." The record is not so clear. In denying the defendant's motion, Judge Linn commented that the detectives were not on a "lark" in pursuit of incriminating evidence after the defendant was first brought to Area Four. There would be no need for this comment had Judge Linn ruled the defendant was arrested on probable cause at his home. See 725 ILCS 5/114—12(e) (West 2006) (ruling on suppression motion should "state the findings of fact and conclusions of law").

defendant was subject to a limited pat down *before* he entered the police vehicle on his way to Area Four adds little to his claim that he was seized at Area Four before he gave his inculpatory statement. Nor does the initial voluntary nature of the defendant's cooperation get transformed into the product of police coercion because the defendant accompanied the officers in the police car rather than taking his own means of transportation (*Myrick*, 274 Ill. App. 3d at 989 ("[a] police officer can drive a person to the police station for a voluntary interview")) or because the officers possessed weapons at the time of the encounter at the defendant's home (*Cosby*, 231 Ill. 2d at 287 (that officers were carrying guns "does not mean that they have thereby displayed the guns in the manner contemplated by *Mendenhall*")).

Nor are we aware of any authority that holds a seizure occurred based on Detective Bor's directive to the defendant that he should stay in the interview room and knock on the door should he need assistance, while he and his partner attempted to locate witnesses that might corroborate the defendant's version of events. Of course, following his arrival at Area Four, the police never told the defendant that he was free to leave. See *Cosby*, 231 Ill. 2d at 288 (police under no legal compulsion to inform an interviewee that he is under no obligation to remain to be interviewed), citing *Ohio v. Robinette*, 519 U.S. 33, 35, 136 L. Ed. 2d 347, 352, 117 S. Ct. 417, 419 (1996). Nor, however, was he told that he must remain pursuant to police detention or that he was formally under arrest. Telling the defendant that a police officer would escort him to the restroom appears to be within reasonable bounds of a voluntary encounter to ensure that the station, necessarily a secure environment where evidence and reports of crimes may be present, remains secure. A request that a voluntary guest at a police station be accompanied while at the police station is not an indication that the individual is no longer a guest, but a person seized, at least in the absence of other indicia of a seizure. See *Washington*, 363 Ill. App. 3d at 24 ("No factor is dispositive and courts consider all of the circumstances surrounding the detention in each case").

Of course, as the length of a person's presence at a police station grows, the voluntariness with which the person first arrives may tend to dissipate. See *People v. Young*, 206 Ill. App. 3d 789, 801, 564 N.E.2d 1254 (1990) ("the fact that a defendant initially accedes to a police request to accompany them to the police station does not legitimize the treatment of defendant after he arrived at the station"). It is difficult to say when an interviewee's presence at the police station that begins voluntarily transforms into a coerced stay, an unreasonable seizure. See *People v. Reynolds*, 257 Ill. App. 3d 792, 800, 629 N.E.2d 559 (1994) ("Even if a defendant was not told that he was under ar-

rest, not touched by a police officer, not handcuffed, fingerprinted, searched, or subjected to any other arrest procedures, he may have been illegally detained if he was not told that he could leave *and* he did not feel free to leave" (emphasis added)).

It remains, however, the defendant's burden to demonstrate that his continued presence at Area Four, including an overnight stay, constituted an illegal seizure. *People v. Graham*, 214 Ill. App. 3d 798, 806, 573 N.E.2d 1346 (1991) (it is defendant's burden to show that a seizure occurred and that the seizure was illegal). The length of time alone is, as a matter of law, insufficient to transform the voluntary presence of a citizen at a police station into a fourth amendment violation. *Prince*, 288 Ill. App. 3d at 273. Cases assessing whether an initial voluntary presence at the police station for an interview transforms into an illegal seizure list a variety of factors to be considered under the totality-of-the-circumstances standard. See *Prince*, 288 Ill. App. 3d at 273 (listing seven factors courts consider to determine whether "a reasonable person would have believed that he was free to leave"); *Washington*, 363 Ill. App. 3d at 24 (listing 10 factors courts consider to determine "whether a defendant was arrested").

According to Detective Bor's trial testimony, the defendant was given food and water and free use of the bathroom, albeit in the presence of an escort. It is also clear that the detectives were confronted with suspicious circumstances involving the injury to the defendant's brother and Robinson's murder. The defendant claimed that Brandon shot his brother in the hand for no apparent reason in an alley several blocks away from the alley where Robinson's body was found; witnesses saw Robinson's car, the keys to which the defendant had, speed away from the same alley where Robinson's body was discovered. The defendant added, with no explanation, that he and Brandon "somehow settled" the incident involving his brother being shot in the hand by Brandon. That additional information was sought to help explain the defendant's nearly incomprehensible account of the events leading to the shooting of his brother is part of the "investigatory function of the police." *People v. Wipfler*, 68 Ill. 2d 158, 168, 368 N.E.2d 870 (1977) (to hold that the mere request that an individual accompany officers to the police station to assist in investigating a crime translates into an arrest of that person "would mean that the police could not request the presence of anyone, even for noncustodial questioning, unless and until they had probable cause to arrest the person to be questioned"). In fact, it was the defendant that provided the detectives with the name of Darryl Lee as an individual that would corroborate the defendant's version of events. In the course of their investigative function, the detectives sought to interview Lee before questioning the

defendant further. See *Prince*, 288 Ill. App. 3d at 273 (an attempt to locate the perpetrator of the crime as suggested by the defendant in an earlier interview while the defendant remained at the police station did not constitute an illegal seizure). The defendant was directed to remain at Area Four while the detectives sought to corroborate the defendant's statements by interviewing others; there is nothing in the record to support the inference that the detectives were seeking to keep the defendant at Area Four while they attempted to gather additional facts to create probable cause to arrest the defendant.

If the defendant sought to cease his cooperation with the police, he was free to make his intentions clear. The record is barren of any such evidence. We have no testimony from the defendant that at some point during his stay at the police station, he felt his stay was a product of police coercion. To the contrary, the defendant continued to demonstrate his voluntary cooperation with the police the day after his overnight stay, by his willingness to undergo a polygraph examination. Apparently, the defendant believed he could sway the polygraph examiner, as he perhaps believed he was swaying the investigating detectives that he had no involvement in Robinson's death. By providing names of individuals that would corroborate his version of events, we infer the defendant's aim was to end his involvement in the investigation.

To support his claim of an unlawful seizure, the defendant places heavy reliance on *People v. Lopez*, 229 Ill. 2d 322, 892 N.E.2d 1047 (2008). However, the presence of factors manifesting a coercive atmosphere makes the *Lopez* case substantially different. In *Lopez*, two detectives came to the 15-year-old defendant's home and asked him to accompany them to the police station. *Lopez*, 229 Ill. 2d at 347. Much as here, the defendant's decision to accompany the detectives to the police station was found to be voluntary. "[T]he evidence suggests that defendant's decision to accompany the police was voluntary and not the result of coercion." *Lopez*, 229 Ill. 2d at 352. Whether that voluntary cooperation dissipated at the police station became the critical issue. That the defendant's initial presence at the police station was voluntary, "does not negate the possibility that subsequent police conduct was unlawful." *Lopez*, 229 Ill. 2d at 352. "[W]e now consider whether a reasonable juvenile, in defendant's position, *** would not have felt free to leave once there." *Lopez*, 229 Ill. 2d at 346-47.

The juvenile was placed in an interview room with the door closed, was immediately interviewed, and was told he was implicated in a murder. *Lopez*, 229 Ill. 2d at 353. He was told to wait in the room. *Lopez*, 229 Ill. 2d at 353. He was not allowed to go anywhere in the station without an escort, and he "remained in the interview room for

four hours without contact with his family or any other person interested in his well-being" before he signed a confession. *Lopez*, 229 Ill. 2d at 353.

Whether a reasonable juvenile, in the *Lopez* defendant's position, would not have felt free to leave appears to have been answered, to a great extent, in the first 20 minutes of the defendant's questioning by the detectives at the police station. The 15-year-old juvenile was told by the detectives that he was "implicated in the crime [of murder]." *Lopez*, 229 Ill. 2d at 353. The statement clearly conveyed to the defendant that the detectives had knowledge of his involvement in the murder, that the "focus of their investigation" centered on the defendant, and that he should infer that he was not free to leave. *Prince*, 288 Ill. App. 3d at 273 (the fifth of seven factors listed to support a finding of a seizure). The defendant also testified that he believed he was locked in the interview room, even though the detectives said the door, while closed, was unlocked. *Lopez*, 229 Ill. 2d at 353. The police, having concluded that the defendant was implicated in the murder, left the defendant at the police station to conduct further investigation with the apparent aim of obtaining probable cause for the defendant's arrest. *Lopez*, 229 Ill. 2d at 353-54.

Under the totality of the circumstances present in *Lopez*, where the defendant was told he was implicated in the murder, was placed in a closed interview room that, from the defendant's perspective, appeared to be locked, an inference consistent with the instruction that he must "knock" on the door to gain the attention of someone on the other side as opposed to merely opening the door, where he was a minor at the time, and where he had no contact for four hours "with his family or any other person interested in his well-being" (*Lopez*, 229 Ill. 2d at 353), the supreme court determined that the "[d]efendant's voluntary presence at the police station escalated into an involuntary seizure in violation of defendant's fourth amendment rights." *Lopez*, 229 Ill. 2d at 353. The supreme court noted that a person voluntarily at the police station does not " 'implicitly consent[ ] to remain in the police station while the police investigate the crime to obtain probable cause for the interviewee's arrest.' " *Lopez*, 229 Ill. 2d at 353-54, quoting *Barlow*, 273 Ill. App. 3d at 950. "This is particularly true when the person in question is a minor." *Lopez*, 229 Ill. 2d at 354.

The circumstances present in *Lopez* are a far cry from the circumstances present in this case. The defendant was not a juvenile, inexperienced with the criminal justice system; that he was isolated from family members is a factor entitled to little consideration under the totality-of-the-circumstances standard. Prior to the polygraph

examination, the evidence suggests that the focus of the police investigation of the murder had not yet centered on the defendant and his brother. The defendant was providing information to the police consistent with his claim of noninvolvement in the murder of Robinson. The defendant remained at the police station to allow corroboration of his version of events involving the shooting of his brother and to explain away his possession of Robinson's car keys. Unlike in *Lopez* and in *Washington*, we find nothing in the record to suggest that the detectives were investigating " 'the crime to obtain probable cause for the interviewee's arrest.' " *Lopez*, 229 Ill. 2d at 353-54, quoting *Barlow*, 273 Ill. App. 3d at 950; *Washington*, 363 Ill. App. 3d at 26 ("The trial court's statement that the defendant 'always persisted in telling the police that she had information about what had happened' finds no support in the record, because the police interviewed the defendant only once during the 23 hours that she was in the station").

Also, the defendant did not testify at the suppression hearing, so we have no information that he, no less than a reasonable person in his situation, felt that he was not free to leave the police station at any point during the time he spent in the interview room before he gave his inculpatory statement. See *Young*, 206 Ill. App. 3d at 801 (among factors favoring illegal seizure was State's failure to rebut the defendant's contentions). Moreover, Judge Linn found Detective Bor, the only witness to testify at the hearing on the defendant's motion to quash arrest, to be credible. The defendant makes no contention that Judge Linn should have rejected Detective Bor's "testimony as clearly unreasonable." See *People v. Clark*, 92 Ill. 2d 96, 99, 440 N.E.2d 869 (1982).

We reject the defendant's implicit contention that, as a matter of law, the totality of the circumstances present in this case establishes an unlawful seizure of the defendant. See *Clark*, 92 Ill. 2d at 99 (where the circuit court grounds its ruling denying the defendant's motion to suppress on the only credible witness to testify at the hearing and there is no basis "to reject the officer's testimony as clearly unreasonable," to overturn the ruling below, a court of review must determine that as a matter of law the testimony establishes the applicable legal requirements).

■ Here, the defendant's continued presence in the police station is just as well explained by his willingness to continue to cooperate with the police in the hope of persuading the detectives of his noninvolvement in the murder of Robinson. This inference is perhaps best supported by the defendant's willingness, after his overnight stay and hours before his formal arrest, to undergo a polygraph examination. Under these circumstances, we cannot say that the defendant

was seized at any time prior to his formal arrest at 5 p.m. on November 15, 2003, following his admission of his role in the shooting. The record evidence does not support the defendant's contention that, as a matter of law, the detectives conveyed to the defendant that his overnight stay at the police station, a stay which started as a voluntary act on the defendant's part, considered in light of the circumstances present on the day he agreed to take a polygraph exam, was now the result of police coercion. See *People v. Jackson*, 348 Ill. App. 3d 719, 728-29, 810 N.E.2d 542 (2004) (officer's testimony that his intent in confronting the defendant on the street was to arrest him is a proper factor in deciding whether an illegal seizure occurred).

Under the totality of the circumstances present in this case, we find that a reasonable person, who began his cooperation with the police voluntarily, would have believed that his continued cooperation remained a matter of his own volition. The factors to be considered in assessing whether an accused has been detained do not support the legal conclusion that the defendant was not, in fact, free to leave. *Prince*, 288 Ill. App. 3d at 273. The defendant has failed to demonstrate that he was seized at any point prior to his formal arrest. *Cosby*, 231 Ill. 2d at 274.

## Interview by Forensic Detective

The defendant's final contention is that Judge Linn erred in allowing Detective Bor to testify in the State's case-in-chief about the defendant's interview with Detective Howley, a "forensic investigator," at the Homan Square facility on November 15, 2003. The defendant argues that Detective Bor's testimony improperly placed before the jury the inference that the defendant took and failed a polygraph examination. The defendant equates the inference arising from the disputed testimony with the admission of polygraph evidence.

It is well established that evidence that a defendant took a polygraph examination and the results of that examination are inadmissible in the State's case-in-chief because "(1) the evidence is not sufficiently reliable, and (2) the results may be taken as determinative of guilt or innocence despite their lack of reliability." *People v. Washington*, 363 Ill. App. 3d 13, 20, 842 N.E.2d 1193 (2006), citing *People v. Jefferson*, 184 Ill. 2d 486, 492-93, 705 N.E.2d 56 (1998). In most cases, "the prejudicial effect of admitting such evidence substantially outweighs its probative value, and *** admission of the evidence constitutes ' "an unwarranted intrusion" into the trier of fact's role in determining the credibility of the witnesses.' " *Washington*, 363 Ill. App. 3d at 20, quoting *People v. Jackson*, 202 Ill. 2d 361, 368, 781 N.E.2d 278 (2002), quoting *People v. Baynes*, 88 Ill. 2d 225, 244, 430 N.E.2d 1070 (1981).

A limited exception exists where the evidence is used in "rebutting a defendant's claim that his confession was coerced." *Washington*, 363 Ill. App. 3d at 20, citing *Jefferson*, 184 Ill. 2d at 493. Our supreme court has made clear, however, that while the State may use "polygraph evidence as a shield against the defendant's allegation of police misconduct," it may not "attempt[ ] to use the evidence affirmatively as a sword to advance its own case." *Jackson*, 202 Ill. 2d at 371. In deciding whether to admit polygraph evidence, trial courts "should apply enhanced scrutiny to ensure that any references to a polygraph are necessary" given that "there are no scenarios in which the potential for prejudice would not exist." *People v. Rosemond*, 339 Ill. App. 3d 51, 60-61, 790 N.E.2d 416 (2003).

■ At trial, Detective Bor testified that after he interviewed the defendant between 1:30 and 4 a.m. on November 15, 2003, the defendant gave a somewhat different story of the events of November 13, 2003, from the one he gave in his initial interview. After his second interview, Detective Bor asked the defendant whether he would be "willing to be interviewed by a forensic investigator who works in another unit." The defendant agreed. Detective Bor testified that this interview would be conducted at the "forensics division" in the Homan Square facility four blocks away, which is a "specialized" unit of the police department. Detective Bor called the "forensics division" to schedule the interview with "forensic investigator" Howley. The prosecutor asked Detective Bor if, after this 1.5-hour interview, he "discussed" with Investigator Howley "the course of his interview with the Defendant," and he responded he did. The prosecutor also asked whether Detective Bor "discussed" with the defendant "what had taken place during his interview with *** Investigator Howley," whom the prosecutor also referred to as "the forensic guy." Detective Bor indicated he had such a discussion with the defendant, after which the defendant admitted his role in Robinson's murder.

Because this testimony was admitted in the State's case-in-chief, we address first the relevance of such testimony. This testimony appears to add little if anything to the ultimate question before the jury of the defendant's guilt or innocence of the first degree murder of Robinson. Nor does the State identify any fact in consequence, the existence of which the disputed testimony would make more or less probable than it would be without this testimony. See *People v. Beaman*, 229 Ill. 2d 56, 75-76, 890 N.E.2d 500 (2008) ("evidence is relevant if it tends to make the existence of any fact in consequence more or less probable than it would be without the evidence"). In fact, the State offers no explanation for the repeated references to a "forensic investigator" in a separate, "specialized" unit during its direct

examination of Detective Bor. Nor do we find any relevance to this testimony with the circumstances of Robinson's death at approximately 11 p.m. on November 13, 2003.

The description of a "specialized" investigator from the "forensics division" did, however, create the impression before the jury that the police felt it necessary to apply some level of enhanced interrogation to the defendant's previous statements. But any reference to such extraordinary "forensic" questioning appears entirely outside the scope of relevant facts going to prove the defendant's guilt beyond a reasonable doubt. Nor do the facts that Detective Bor and the mysterious "forensic guy" discussed "the course of his interview with the Defendant," and that Detective Bor and the defendant later discussed "what took place" during that interview, shed any additional light on the defendant's possible involvement in Robinson's shooting death in the alley at 3548 West Cermak. If this disputed testimony improperly apprised the jury that the defendant had taken and failed a polygraph, we would be compelled to conclude that the "prejudicial effect of admitting such evidence substantially outweigh[ed] its probative value." *Washington*, 363 Ill. App. 3d at 20. Setting aside for the moment whether the jury was so apprised, it appears clear that this testimony created the risk of substantial prejudice should the testimony veer into explicit polygraph evidence. *Rosemond*, 339 Ill. App. 3d at 61.

Appearing to acknowledge the apparent irrelevance of Detective Bor's testimony, the State contends that the defendant "opened the door" to that testimony by defense counsel's opening statement, which, according to the State, was "clearly calculated to convince the jury that defendant was coerced" into signing the statement prepared by ASA Papa. The State quotes at length from defense counsel's opening statement:

> "Now, on November 14, the day after, approximately two-thirty p.m., my client met up with police at his house. The police officers drove him to a police station. They drove him to a police station and placed him in a small interview room. A small room. A room with hard walls, hard floors. This room had no windows. It had a door that was kept closed. There was [*sic*] no windows on that door. The room has no clock. It has no facilities, no toilet facilities. There was no food or water provisions in that room. There was no bed in that room.
>
> Now, my client was questioned by police officers and by a prosecutor. Fifty-three hours later. Fifty-three hours later, a prosecutor presented a handwritten statement to him, handwritten by the prosecutor for him to sign. And he did.

Now, this statement, as I say was handwritten by a prosecutor. Not written by him. And this wasn't a videotaped statement. That could be played on the TV for you to see. To look at the demeanor of the person speaking and make your own decision about that statement. This is not a statement taken by a stenographer like you see the Court Reporter today. A third party, not a member of the police, who is taking down what the witness is saying. You don't have the benefit of that.

And it wasn't an audio tape where you can hear the statement from the witnesses [sic] own lips. You can hear and sort of get a feeling for how the witness is making the statement. This was a handwritten statement by a prosecutor. This is what the Defendant signed."

We reject the State's characterization of this excerpt of the defendant's opening statement as having opened the door to what was otherwise irrelevant "forensic" evidence. In laying out a zealous defense, defense counsel must be free to call into question the highly incriminating nature of the defendant's confession without, at the same time, being deemed to have opened the door to irrelevant, if not, prejudicial evidence. See 725 ILCS 5/103—2.1 (West 2006) (effective July 18, 2005, all interrogations not electronically recorded where death has in fact occurred are presumed inadmissible).

Moreover, the excerpt of the defendant's opening statement addressed only the handwritten statement by ASA Papa. We see no connection between any "forensic investigation" that necessitated travel to a separate facility housing this "specialized" unit four blocks away and the handwritten statement signed by the defendant approximately 24 hours after his interview with the "forensics investigator." The handwritten statement was not precipitated by the defendant's failure of the polygraph examination; the handwritten statement flowed from the defendant's oral confession to Detective Bor. Only the defendant's oral confession to Detective Bor at 5 p.m. on November 15, 2003, was precipitated by the defendant's failure of the polygraph examination. No mention of the defendant's oral confession was made in the excerpt of the defendant's opening statement set out in the State's brief.

Nor does the State present any authority suggesting that defense counsel's description of the conditions of the interview room amounts to a claim that the ultimate confession by the defendant was the result of police coercion, which, in turn, opens the door to rebuttal evidence. See *Jefferson*, 184 Ill. 2d at 493 (admission of polygraph evidence proper where defendant claimed police misconduct by promising to release her from custody so she could see her family upon giving a confession), citing *People v. Triplett*, 37 Ill. 2d 234, 239, 226 N.E.2d 30

(1967). That the State relies so heavily on defense counsel's opening statement to justify the admission of the disputed testimony lends support to the defendant's claim that the "forensic" testimony of Detective Bor raised the very inference the defendant claims, that of a failed polygraph exam.

Nor is the "limited purpose" Judge Linn alluded to in admitting this evidence clear on the record before us. See *Jackson*, 202 Ill. 2d at 369-70 (noting trial judge's failure to clearly define the limited purpose for which polygraph evidence was admitted). In expanding on the side-bar regarding Detective Bor's testimony, Judge Linn stated that he "was satisfied that [the testimony] would not cause any unfair prejudice," without ruling on its relevance. Judge Linn's brief mention that defense counsel "made quite a bit of talk" about the time period the defendant spent at Area Four suggests that he too believed the disputed testimony was admissible to rebut any claim of police coercion, much as polygraph evidence may be introduced in rebuttal. See *Jefferson*, 184 Ill. 2d at 493 (polygraph evidence may be introduced for the limited purpose of *rebutting* defendant's claim of a coerced confession). However, defense counsel's "talk" during opening statements makes clear his intention to call into question the weight to be given to the confession (as, of course, he had to) because it was given approximately 24 hours after the defendant was formally arrested, and not because of some unknown and unstated contention of police coercion. Judge Linn's statement that "I think it was handled properly" provides no justification for the introduction of irrelevant evidence.

Additionally, both Judge Linn's and the State's references to the defendant's cross-examination of Detective Bor misapprehend the limited scenario in which polygraph evidence can be appropriately introduced. Detective Bor's statements came during his direct examination. It is perhaps an overstatement of the obvious that cross-examination covering testimony already before the jury cannot rationally be deemed to have opened the door for evidence introduced during direct examination. As our supreme court made clear, the State may not make preemptive use of evidence that apprises the jury of a polygraph examination to counter a coercion argument, as yet unmade. Such evidence introduced in the State's case-in-chief "serve[s] no proper legal purpose." *Jackson*, 202 Ill. 2d at 370-71.

Ultimately, however, the real question before us is whether the disputed testimony, irrelevant as it was, "clearly signaled the jury that [the defendant] had taken and failed a polygraph." *People v. Johnson*, 208 Ill. 2d 53, 103-04, 803 N.E.2d 405 (2003). Based on our close examination of the record before us, we reject the defendant's conten-

tion that the only inference to be drawn from the disputed testimony was that "a testing device was employed in the interview [with the forensics investigator]." *Johnson*, 208 Ill. 2d at 104. Much as our supreme court held in *Johnson*, we find that Detective Bor's forensic testimony did not improperly apprise the jury that the defendant had taken and failed a polygraph. *Johnson*, 208 Ill. 2d at 104.

The disputed testimony offered nothing more than irrelevant evidence, the admission of which the defendant does not contend amounts to reversible error. We note the defendant never filed a pretrial motion *in limine* to bar the introduction of the testimony he now contends improperly apprised the jury of his polygraph examination given by Investigator Howley. See *People v. Owen*, 299 Ill. App. 3d 818, 822, 701 N.E.2d 1174 (1998) ("Motions *in limine* are designed to call to the attention of a trial court, in advance of trial, some evidence which, because of its potentially prejudicial nature, cannot be discussed in the jury's presence until the court has determined it is admissible").

We are unpersuaded by the defendant's argument that Detective Bor's testimony was the equivalent of polygraph evidence because, as Judge Linn noted, "[t]he word polygraph never came out of anybody's mouth, nor the fact [the defendant] flunked any test." The terms "forensic investigator" and "forensic interview" are not tantamount to polygraph evidence because the "terms [do not] alert the jury that a testing device was employed in the interview." *Johnson*, 208 Ill. 2d at 104. Nor are we persuaded that the terms "forensic investigator" and "forensic interview" in the context of this case are the equivalent of "technician" or "examiner" that have been found to improperly convey to the jury the use of a polygraph. See *People v. Mason*, 274 Ill. App. 3d 715, 653 N.E.2d 1371 (1995); *cf. Johnson*, 208 Ill. 2d at 104 (absence of the terms "technician" or "examiner" in testimony sufficient to distinguish case from *Mason*). Here, Detective Bor never testified to any result of the defendant's interview with Detective Howley.

We conclude Detective Bor's testimony was too vague to apprise the jury that the defendant changed his story after failing a polygraph examination. Under the facts of this case, the disputed testimony by Detective Bor, while irrelevant, did not amount to polygraph evidence.

## CONCLUSION

The defendant was not seized until his formal arrest by the interviewing detectives after he incriminated himself in the murder of Kenji Robinson. The defendant does not dispute that he voluntarily accompanied police officers to Area Four from his home on November

14, 2003. The evidence demonstrates that the defendant willingly agreed to undergo a polygraph examination during his second interview by the investigating detectives, approximately 12 hours after he voluntarily accompanied the police to Area Four. The delay in scheduling the polygraph exam kept the defendant at Area Four an additional 12 hours, to which he never complained. The defendant failed to establish that his overnight stay at Area Four, which began as a voluntary act on the part of the defendant, was transformed into a seizure at any point prior to his formal arrest on probable cause at approximately 5 p.m. on November 15, 2003. Additionally, no reversible error occurred based on Detective Bor's irrelevant, but not prejudicial, testimony that the defendant was interviewed by a forensic investigator, after which he confessed to aiding and abetting in the murder of Robinson.

We affirm the defendant's conviction for first degree murder.

Affirmed.

PATTI, J., concurs.

PRESIDING JUSTICE HALL, dissenting:

I respectfully dissent. I believe that the defendant's statements should have been suppressed as the fruit of an unlawful seizure.

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, ' "by means of physical force or show of authority," ' terminates or restrains his freedom of movement [citation] 'through means intentionally applied' [citation]." (Emphasis omitted.) *Brendlin v. California*, 551 U.S. 249, 254, 168 L. Ed. 2d 132, 138, 127 S. Ct. 2400, 2405 (2007). Courts look to the totality of the circumstances in determining whether a particular encounter constitutes a seizure implicating fourth amendment rights. *People v. Prince*, 288 Ill. App. 3d 265, 273, 681 N.E.2d 521 (1997).

The test of whether a seizure has occurred is based on whether, in light of all the surrounding circumstances, a reasonable person in the defendant's situation would have believed he was not free to leave. *People v. Sturgess*, 364 Ill. App. 3d 107, 113, 845 N.E.2d 741 (2006). In the instant case, I believe that the defendant's voluntary encounter with police detectives escalated into a seizure where he was interrogated after receiving *Miranda* warnings and thereafter ordered to remain in an interrogation room, where he stayed overnight and was required to ask for permission to go to the bathroom.

Under the totality of the circumstances, I do not believe that a reasonable person in defendant's situation would have felt free to decline the detectives' orders or otherwise terminate the encounter. See, *e.g.*, *People v. Booker*, 209 Ill. App. 3d 384, 393-94, 568 N.E.2d 211 (1991). Moreover, I believe that the seizure was illegal because the police lacked probable cause to arrest defendant at that time.

Probable cause for arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution to believe that an offense has been committed and that the person arrested committed the offense; mere suspicion that the person arrested has committed the offense is insufficient. *Booker*, 209 Ill. App. 3d at 393-94. Furthermore, a probable cause determination may not be based upon the results of a polygraph examination. *Booker*, 209 Ill. App. 3d at 394.

In sum, I believe that the defendant's statements should have been suppressed because they resulted from the illegal seizure and there was no intervening event to purge the taint of the illegal detention. Accordingly, I respectfully dissent.