2017 IL App (1st) 140893

SECOND DIVISION
January 31, 2017

No. 1-14-0893

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 09 CR 20467 |
| | ) | |
| RAUL SOTO, | ) | The Honorables |
| | ) | Thaddeus L. Wilson and |
| Defendant-Appellant. | ) | Erica L. Reddick, |
| | ) | Judges Presiding.[1] |

JUSTICE MASON delivered the judgment of the court with opinion.
Justice Pierce concurred in the judgment and opinion.
Presiding Justice Hyman concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1     Following a jury trial, defendant Raul Soto was convicted of first-degree murder for the deadly beating of his roommate and sentenced to 27 years' imprisonment. During the murder investigation, Soto voluntarily accompanied police to the police station and cooperated with the investigation. After spending two nights at the police station, Soto made three incriminating statements confessing to the murder of his roommate, Ventura Colin.[2]

¶ 2     Soto filed pretrial motions, seeking to quash his arrest, asserting that his voluntary presence at the police station transformed into an illegal arrest, and claiming that all three incriminating statements were inadmissible because they were (1) the fruit of an illegal arrest; (2)

_____

[1] Judge Wilson ruled on the parties' pretrial motions and Judge Reddick presided over Soto's trial.

[2] The record identifies the victim as both "Ventura Colin" and "Colin Ventura." We adopt "Ventura Colin" as the victim's name.

the product of a deliberate "question first, warn later" interrogation technique; and (3) the result of an invalid waiver of his *Miranda* rights. After hearings on Soto's pretrial motions, the trial court found that the police never unlawfully detained Soto. The trial court agreed with Soto that his first two incriminating statements were inadmissible mainly because, although the police had probable cause to arrest Soto for the murder, they failed to give him *Miranda* warnings before eliciting an incriminating statement and the taint from that statement rendered inadmissible his second statement given minutes after his first. But the trial court found that Soto's third incriminating statement, given more than 24 hours later, was admissible based on the curative measures taken after the unwarned interrogation. The trial court also found that Soto voluntarily, knowingly, and intelligently waived his *Miranda* rights, despite his asserted cognitive defects and low intelligence level.

¶ 3        On appeal, Soto challenges the admissibility of his third incriminating statement. Finding no error in the trial court's rulings, we affirm.

¶ 4                                BACKGROUND

¶ 5        On October 4, 2009 around 7 p.m., Chicago police officer Gaspar and his partner responded to a 911 call near 2600 South Kedzie Avenue in Chicago. The officers arrived at a gas station and saw Soto and his friend, Alberto Alfaro. Soto spoke only Spanish and Officer Gaspar communicated with him in Spanish. Soto told Gaspar that his other friend (Colin) was dead. Soto entered the police vehicle and directed the officers to Soto's home located at 3158 South Kedzie Avenue. Soto's "home" at that address was an abandoned two-story house, filled with empty beer cans and other junk, with apparently no heat, electricity, or running water. The officers found Colin dead on a mattress in one of the bedrooms on the second floor. Soto told the officers that he found Colin dead after he entered the bedroom that morning at about 6 a.m. Detective

Nickeas of the Chicago police department also arrived at the scene to investigate and directed the officers to ask Soto for his assistance.

¶ 6    Officer Gaspar asked Soto if he would accompany them to the Area 4 police station to assist the detectives with the investigation. Soto agreed, responding that he wanted to find out what happened to his friend. Officer Gaspar and his partner transported Soto to Area 4 in a marked police vehicle with Soto sitting in the back behind a cage separating him from the officers. Soto was not handcuffed. Officer Gaspar did not ask Soto if he wanted to find his own way to the police station.

¶ 7    After arriving at the station, Officer Gaspar took Soto to a small, windowless interview room. The interview room was not earmarked for use only by criminal suspects; instead, the room was used to interview witnesses and victims, as well as suspects. Officer Gaspar left Soto in the interview room with the door open and he was neither handcuffed nor arrested. Officer Gaspar spoke to Soto exclusively in Spanish.

¶ 8    Detective Nickeas returned to the police station after surveying the crime scene and spoke with Soto in the interview room with the aid of another detective, who served as a translator. When Detective Nickeas arrived at the interview room, the door was unlocked and open. Soto was not handcuffed, restrained, or shackled to anything. Two other detectives were also in the room.

¶ 9    Through the translator, Soto told the detectives that he had last seen Colin alive on October 3 before Soto went out for the night to a bar. The next morning at about 6 a.m., Soto went upstairs to wake Colin to go collect cans and found him dead. Soto tried to call 911 from a pay phone at a gas station near 28th and Kedzie, but was unable to make the telephone call. Soto

looked for his and Colin's mutual friend, El Moro, for advice on what to do, but could not find him. Soto later enlisted Alfaro to call 911 for him.

¶ 10    After the detectives spoke to Soto for about 5 or 10 minutes, Soto was told that he was free to leave the police station. But Soto did not leave and instead slept in the interview room, explaining that he had no place to go since his home was a crime scene. The detectives did not provide Soto with a pillow, blanket or mattress. There was a metal bench in the interview room on which Soto slept. Although the detectives did not arrange for alternative lodging, such as a homeless shelter, it was Soto's decision to sleep at the station, and he never requested to leave.

¶ 11    Because the interview room was located near the desks of other detectives, who were working on cases, the area was considered a protected area, and all civilians, including Soto, were not allowed to freely walk around unescorted. Therefore, Soto had to ask an officer to escort him to the restroom. But Soto was not treated any differently than any other witness at the police station in an interview room.

¶ 12    Detective Roberto Garcia first met Soto the following morning—October 5—after Soto spent the night in the interview room. Soto was not handcuffed, and the interview room's door was unlocked. Detective Garcia gave Soto some clothes because he smelled "really bad," but he did not give Soto a paper jumpsuit to wear, which police typically provide when taking clothes for inventory purposes. Detective Garcia, who also spoke Spanish, thanked Soto for his cooperation and told him that he was free to leave at any time. Soto responded that he was glad to assist and would stay as long as necessary to help find who killed his roommate. Soto also indicated that he was homeless and had nowhere else to go.

¶ 13    After speaking with Soto, Detective Garcia went to the scene and found a receipt dated October 3 from United Metal Scrap Recycling Company and another one from a liquor store. He

also saw the name "El Moro" painted on a wall in the first floor bedroom of the house. While in the area, Detective Garcia directed a search for pay phones because Soto had told the other detectives that he had attempted to call 911 from a pay phone earlier on October 4. The investigation revealed that no phone calls to 911 from pay phones in the area were made on October 4.

¶ 14     Meanwhile, Detective Nickeas went to the scrap recycling company to ask questions. A worker said he saw Soto there with two other Hispanic males on the morning of October 3.

¶ 15     Detective Garcia returned to the station and sometime after 5 p.m., asked Soto about his activities on October 3. Soto responded that he worked an 8 or 10 hour shift doing construction work with his friend, David Casarubias, and Casarubias' father, until approximately 5 p.m. Soto then went home and last saw Colin alive at around 8 or 8:30 p.m. when Soto left to get beer.

¶ 16     Soto also provided Detective Garcia with names of people who might have relevant information, including El Moro and Casarubias. Soto further mentioned that he went to his cousin Herculano Morales's house after finding Colin dead to get help and advice on what to do.

¶ 17     Around 8 p.m., Soto left the police station with Detective Garcia and his partner to show them where El Moro and the other individuals lived. Soto was not handcuffed. Soto and the detectives traveled in an unmarked vehicle and drove around the neighborhood with Soto pointing out different locations, including the residences of El Moro, Morales, and Casarubias. At that time, the detectives did not get out of the vehicle to approach the houses. The detectives transported Soto back to the police station and returned him to the same interview room.

¶ 18     Soto remained in the interview room while Detective Garcia left the police station to locate El Moro and Soto's cousin at the houses that Soto pointed out, but the houses that the detective went to were not the correct ones. Detective Garcia returned to the station and told Soto

that the houses he pointed out were incorrect. Soto said he could have made a mistake and offered to clarify and show him the houses again. But Detective Garcia had to start working on a different investigation and arranged with Soto to continue the investigation in the morning. Detective Garcia asked Soto if he would stay in the area and cooperate with the investigation, and he agreed. Soto spent a second night at the station again with no blanket, pillow or mattress.

¶ 19    The next morning—October 6—Detectives Roger Lara and Salvador Esparza continued to look for El Moro with Soto's assistance. Soto traveled with the detectives in an unmarked police vehicle and again pointed out El Moro's house, which was just one house away from the house that Detective Garcia went to the night before. The detectives approached the house, and an individual identified himself as Javier O'Campo, who had the nickname "El Moro." El Moro agreed to go to the police station for questioning, and the police transported him to Area 4 in a different squad car.

¶ 20    At around 1 p.m., after El Moro arrived at the police station, Detectives Garcia and Lara interviewed him. According to El Moro, on the morning of October 3, he along with Colin and Soto sold some scrap metal that they had collected. After getting paid, they stopped at a liquor store to buy beer and picked up a prostitute. The three men and the prostitute went to the abandoned house where Soto and Colin lived, and Soto went upstairs with the prostitute while El Moro and Colin remained downstairs drinking beer. El Moro and Colin then dropped the prostitute off at her "working" place, and El Moro brought Colin back to the house.

¶ 21    Because of the discrepancies between El Moro's and Soto's story about what Soto had been doing during the day leading up to Colin's death, Detectives Garcia and Lara decided to put them both in the same interview room so the detectives could question them together. The interview room was not locked and neither Soto nor El Moro was handcuffed.

¶ 22    Detective Garcia confronted Soto about the discrepancy between what he said he did on October 3 and what El Moro said about their activities. Soto admitted that he lied and explained that he was embarrassed about picking up the prostitute. The rest of Soto's story was consistent with El Moro's.

¶ 23    Soto remained at the station for the rest of the day. Around 7:30 p.m., Soto accompanied Detective Garcia and another detective to look for Morales, Soto's cousin. Soto was not handcuffed and sat in the back seat of an unmarked squad car. When they arrived at Morales' house, both Detective Garcia and Soto went to the door. Soto was still not handcuffed. Morales identified Soto as "Ramon Morales." Detective Garcia then proceeded to interview Morales while Soto waited in the squad car.

¶ 24    Morales described Soto as a street person, who is usually intoxicated and in some type of trouble. Soto visited Morales around noon on October 4. Soto appeared troubled and told Morales that "he had beat somebody up" and wanted to talk to his sister. Detective Garcia's conversation with Morales lasted about 10 minutes. Afterward, around 9 p.m., the detectives transported Soto back to Area 4. Once at the police station, Soto returned to the same interview room that he had slept in the previous two nights. Soto was not handcuffed, the interview room's door was unlocked, he was not processed and he was not told that he was under arrest.

¶ 25    Around 9:30 p.m., Detective Garcia confronted Soto with the information he had learned from Morales. Soto clutched the bench that he was sitting on, shook his head acknowledging that he had not been truthful, paused for a second, lowered his head and said in Spanish "Okay. I killed him. I hit him." At that point, Detective Garcia immediately stopped the interview because, according to Garcia, he now considered Soto a suspect.

¶ 26     During all prior interviews, the electronic recording interview system (ERI) was never activated because the detectives had not considered Soto a suspect. After Soto's confession, Detective Garcia and his partner turned on the ERI in a different interview room. Within a few minutes of making his first statement, Soto was taken into that interview room.

¶ 27     Soto was then advised of his *Miranda* rights in Spanish and the detectives re-interviewed him beginning at 9:37 p.m. Detective Garcia did not tell Soto that his initial statement confessing to killing Colin would be inadmissible. Soto then revealed where other evidence could be found. Unlike before, Soto did not accompany detectives to locate the other evidence because he was now considered an offender who presented a flight and safety risk.

¶ 28     In his recorded statement, Soto elaborated that after he got home at around 10 p.m. on October 3, he went upstairs to Colin's room and they were at first just drinking but then got into an argument over who got more money from scrapping that day. The argument turned into a physical fight. Soto threw Colin against the wall, grabbed a small stick and "lay some on one side and the other" and kicked him. After Soto stopped beating Colin, he did not know whether Colin was already dead, although Soto claimed that Colin was still talking when he left the room. The next day, Soto went to Morales' house and told him that he beat someone. Soto left, eventually found Alfaro and gave him a quarter to call the police. Soto's recorded statement concluded at 9:56 p.m.

¶ 29     According to Detective Garcia, before 9:30 p.m. on October 6, Soto was not (1) given *Miranda* warnings; (2) arrested; or (3) placed into custody because he was not considered a suspect. Detective Garcia did not consider Soto a suspect until he made his first incriminating statement on October 6 around 9:30 p.m. Soto was thereafter placed under arrest at 9:32 p.m.

¶ 30    The next day on October 7 at 10:02 p.m., Assistant State's Attorney Ruth Gudino interviewed Soto in Detective Garcia's presence in the same interview room that Soto gave his second incriminating statement. A different detective who had not been present for Soto's earlier statements acted as the translator during this interview. Soto's interview with the ASA was recorded. Soto was again given his *Miranda* rights, but the ASA did not advise Soto that his prior incriminating statements would be inadmissible. ASA Gudino questioned Soto about Colin's death, and Soto made further incriminating statements. According to Soto, he and Colin got into an argument because Colin was upset that he and El Moro had to take the prostitute back, and Colin thought that Soto had sex with the prostitute on his mattress. The argument turned physical with Soto repeatedly hitting Colin mostly on the left side of his head with a bat. Soto checked on Colin the next morning and saw him covered in blood. Later in the day, Soto went to see his cousin and told him that he had beaten somebody up and wanted to call the police.

¶ 31    On November 9, 2009, Soto was charged with two counts of first degree murder. Soto filed a pretrial motion to quash arrest and suppress evidence, arguing, in relevant part, that his initial voluntary presence at the police station on October 4, 2009, transformed into an unlawful detention in violation of his constitutional rights under the fourth amendment. Soto also filed a separate pretrial motion to suppress evidence asserting his fifth amendment protection against self-incrimination was violated because detectives did not properly give him his *Miranda* warnings and he did not voluntarily, knowingly, and intelligently waive those rights.

¶ 32    The trial court held an evidentiary hearing, and the investigating detectives and responding officer testified regarding the investigation of Colin's death detailed above. The trial

court also held a separate hearing where experts testified regarding Soto's capacity to voluntarily, knowingly, and intelligently waive his *Miranda* rights.

¶ 33        After the evidentiary hearing on the motion to quash and suppress, the trial court initially suppressed all of Soto's incriminating statements, but refused to suppress any clothing or the names of individuals (El Moro and Morales) that Soto provided during the detectives' investigation. The trial court, however, mistakenly believed that the issue presented by Soto's motion related to the existence of probable cause to suspect that Soto killed Colin and not whether his presence at the police station was voluntary.

¶ 34        The State filed a motion to reconsider and clarify the ruling, asserting that the proper standard to determine whether an individual's fourth amendment rights were violated was not whether officers suspected that Soto killed Colin, but whether a reasonable person would have believed he was not free to leave. The trial court clarified that after Detective Garcia's conversation with Soto's cousin on October 6, Soto's presence at the police station was no longer voluntary, and he, instead, was lawfully seized upon his transport back to the police station because the detectives at that point had probable cause to suspect he killed Colin. But the trial court found unrebutted the detectives' testimony about Soto's voluntary participation in the investigation prior to Detective Garcia's conversation with Morales. Accordingly, the trial court granted the State's motion to reconsider and denied Soto's motion to quash arrest and suppress on fourth amendment grounds.

¶ 35        The trial court also held a bifurcated hearing on Soto's motion to suppress statements based on his contention that all of his statements while in police custody were obtained in violation of his fifth amendment right against self-incrimination because (1) detectives failed to properly advise him of his *Miranda* rights and (2) he lacked the capacity to understand the

*Miranda* warnings when he waived those rights. Having found that the police had probable cause to arrest Soto after their conversation with Morales, the court proceeded to address in the first phase of the hearing whether any or all of Soto's statements were obtained in violation of *Miranda*.

¶ 36    Regarding Soto's claim that he was not properly advised of his rights, the trial court ruled that Soto's unwarned and unrecorded first statement of "I did it. I hit him" was inadmissible because by that point police had probable cause to arrest Soto for Colin's murder and they interrogated him without giving him *Miranda* warnings. The trial court also ruled that Soto's second statement that was recorded after he was advised of his *Miranda* rights was likewise inadmissible because it was tainted by Soto's first unwarned and unrecorded statement given minutes before. Finally, the trial court ruled that Soto's third statement given to ASA Gudino more than 24 hours later was admissible with the exception of any portion of the third statement that repeated his initial confession ("I did it. I hit him"), which was ruled inadmissible. Soto filed a motion to reconsider, arguing mainly that his third incriminating statement was inadmissible under *Missouri v. Seibert*, 542 U.S. 600, 617 (2004), which invalidated the "question first, warn later" interrogation tactic and requires suppression of any statement that was given based on use of that tactic. The trial court disagreed and denied Soto's motion.

¶ 37    Regarding Soto's claim that he lacked the capacity to validly waive his *Miranda* rights, at a later hearing Soto presented expert testimony from Dr. Graciela Viale-Val and Dr. Raul Gonzalez to support his claim that he was incapable of voluntarily, knowingly, and intelligently waiving those rights when the police interrogated him. The State presented expert testimony from Dr. Fidel Echevarria and Dr. Nicholas Jasinski to support its claim that Soto's *Miranda* waiver was valid. The testifying doctors specialized in the areas of psychiatry, psychology, or

neuropsychology. In formulating their opinions, the doctors viewed Soto's videotaped statements and reviewed pertinent medical records. The doctors also all recognized that Soto had alcohol dependence issues.

¶ 38        Dr. Viale-Val's impression was that Soto suffered from cognitive deficits and experienced alcohol withdrawal symptoms at the time of his interrogation on October 6 and October 7. She noted that Soto had a history of delirium tremens (DT) and suffered from severe tremors and tactile and auditory hallucinations. Based on Soto's behavior in the videotaped statements, Dr. Viale-Val believed Soto was suffering from DTs and having some sort of hallucination. According to Dr. Viale-Val, Soto also may have had a previous neurocysticercosis infection, which is a neurological disorder resulting from eating pork that has not undergone proper sanitary conditions. When an individual is infected with neurocysticercosis, the parasite living in the pork eventually enters the brain creating small cysts that often cause neurocognitive problems.

¶ 39        Dr. Viale-Val tested Soto's intelligence and concluded that Soto fell within the lowest 1% level of intelligence and in the "extremely low" category. Given Soto's lack of education, level of cognitive function, and mental state at the time of the interrogations, Dr. Viale-Val opined to a reasonable degree of scientific certainty that Soto did not understand the meaning of the words comprising the *Miranda* warnings. Dr. Viale-Val further believed that although at the time of his interview, Soto appeared to be able to understand such concepts, that understanding was the product of his repeated exposure to the warnings since his arrest, which thereby incorporated the warnings into Soto's rote memory.

¶ 40        Dr. Gonzalez also believed Soto could have been suffering from neurocysticercosis at the time of his interviews. Dr. Gonzales diagnosed Soto with mild diffuse cerebral atrophy based on

Soto's "shrunken brain," which was reflective of his history of alcoholism. Dr. Gonzales found Soto's basic reading ability equivalent to about an 8 year-old and his written passage comprehension equivalent to a 7 year-old. Like Dr. Viale-Val, Dr. Gonzales noted that Soto had previously been hospitalized with very high blood alcohol levels and experienced alcohol withdrawal and DTs on those occasions. According to Dr. Gonzales, Soto could live independently, but he was at risk for making some very poor decisions due to neuropsychological impairments in the area of executive functioning. Dr. Gonzales did not conduct a forensic evaluation to determine whether Soto was capable of knowingly waiving his *Miranda* rights, because that assessment was outside the scope of his expertise.

¶ 41     The State's expert, Dr. Echevarria, believed Soto demonstrated no symptoms of cognitive impairment. Like Soto's experts, Dr. Echevarria also observed Soto engaging in certain behavior in the videotaped statements, such as picking at the wall or at himself, but noted that Soto's behavior would stop the moment the detectives entered the interview room. Dr. Echevarria deemed this significant because if an individual suffers from hallucinations, the hallucinations persist independent of who is present or the surrounding environment. Thus, Dr. Echevarria disagreed that Soto suffered from DTs at the time of his interviews based on his behavior in the videos because DTs are not subtle and cannot be started and stopped at will. Dr. Echevarria opined that there was no evidence in the recorded statements that Soto did not understand the questions being asked of him because the lack of that mental capacity would have been evident. Dr. Echevarria believed to a reasonable degree of medical and psychiatric certainty that Soto understood his *Miranda* rights at the time of his arrest and interrogation.

¶ 42     The State's other expert, Dr. Jasinski, opined to a reasonable degree of psychological and scientific certainty that Soto was capable of understanding the *Miranda* warnings at the time of

his arrest. Dr. Jasinski also believed, based on the videotapes, that Soto was not suffering from DTs or having tactile hallucinations. Like Dr. Echevarria, Dr. Jasinki considered it significant that Soto did not engage in certain behavior, such as picking at the wall or his skin, while talking to detectives. In Dr. Jasinki's opinion, it was highly unlikely that tactile hallucinations would stop in response to anything in the environment, such as detectives entering the interview room, but then return after they left the room. To a reasonable degree of psychological certainty, Dr. Jasinki believed that any alcohol withdrawal symptoms Soto was experiencing would not have affected his ability to understand *Miranda* warnings because the symptoms would have been mild. Dr. Jasinki elaborated that there was no indication of alcohol-related dementia or severe cognitive impairments that would have impacted Soto's ability to understand the *Miranda* warnings.

¶ 43        At the conclusion of the hearing and based on its own review of the videotapes, the trial court ruled that Soto's *Miranda* waiver was valid. The trial court found credible the State's experts' testimony that a person suffering from DTs and hallucinations would be incapable of suppressing them simply because others walked into the room. Thus, the trial court found that Soto's physical condition at the time of his statements did not prevent him from understanding and waiving his *Miranda* rights. The trial court found incredible Dr. Viale-Val's testimony that Soto had learned the *Miranda* warnings since his arrest and picked them up as though they were rote memory. The trial court believed Soto's cognitive impairments and deficits did not mean that he lacked the capacity to understand and waive his *Miranda* rights, concluding it harbored "no doubt about [Soto's] comprehension of the full panoply of *Miranda* rights and the potential consequences of the decision to relinquish them." After denying Soto's motion to suppress, the case proceeded to a jury trial.

¶ 44     Following trial, the jury found Soto guilty of first-degree murder. Soto timely appeals and limits his appeal to the trial court's pretrial rulings on his motions to quash arrest and suppress evidence.

¶ 45                                    ANALYSIS

¶ 46     Soto challenges the admissibility of his third incriminating statement on the basis that the statement was (1) the fruit of an illegal arrest; (2) the product of a deliberate "question first, warn later" interrogation technique; and (3) the result of an invalid waiver of his *Miranda* rights.

¶ 47     Soto first claims that his initial voluntary presence at the police station evolved into an illegal arrest, warranting suppression of his third incriminating statement, as well as his other statements identifying El Moro and Morales and where they could be found for questioning, as fruit of that illegal arrest. Soto contends that he was unlawfully detained long before Detective Garcia's interview with his cousin, which the trial court found provided probable cause to arrest Soto. Because there was no probable cause to detain Soto, at least not prior to the interview with his cousin, and he was not free to leave, Soto claims that his third incriminating statement was inadmissible.

¶ 48     A reviewing court applies a two-part standard of review to a trial court's ruling on a motion to quash arrest and suppress evidence. *People v. Hopkins*, 235 Ill. 2d 453, 471 (2009). We defer to a trial court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence. *Id*. A finding is against the manifest weight of the evidence where the trial court's ruling is " 'palpably erroneous and wholly unwarranted' [citation] or 'appears to be arbitrary, unreasonable, and not based upon the evidence.' " *People v. Shelby*, 221 Ill. App. 3d 1028, 1039 (1991) (quoting *People v. Harris*, 220 Ill. App. 3d 848, 860 (1991)). We

review *de novo* the trial court's ultimate legal ruling on a motion to suppress. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006).

¶ 49    Before determining whether Soto's statement should be suppressed as the fruit of an illegal arrest, we must first determine if Soto was, in fact, illegally detained. An arrest or illegal detention without probable cause violates a citizen's constitutional protections afforded under the fourth amendment against unreasonable searches and seizures. *People v. Lopez*, 229 Ill. 2d 322, 345-46 (2008) (citing U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, § 6); *People v. Washington*, 363 Ill. App. 3d 13, 24 (2006). A seizure occurs when a person's freedom of movement is restrained either by physical force or a show of authority. *Lopez*, 229 Ill. 2d at 345-46; *People v. Melock*, 149 Ill. 2d 423, 436 (1992). For fourth amendment purposes, a seizure is an arrest. *Lopez*, 229 Ill. 2d at 346. To determine whether an individual has been unlawfully seized, the relevant inquiry is whether a reasonable person, innocent of any crime, would conclude that he was not free to leave under the circumstances. *Id.*; *Melock*, 149 Ill. 2d at 437. An individual who voluntarily accompanies police officers for questioning has not been arrested or seized in the fourth amendment sense. *People v. Gomez*, 2011 IL App (1st) 092185, ¶ 58.

¶ 50    Courts consider the following factors to determine whether a voluntary interrogation turns custodial: "(1) the time, place, length, mood, and mode of the encounter between the defendant and the police; (2) the number of police officers present; (3) any indicia of formal arrest or restraint, such as the use of handcuffs or drawing of guns; (4) the intention of the officers; (5) the subjective belief or understanding of the defendant; (6) whether the defendant was told he could refuse to accompany the police; (7) whether the defendant was transported in a police car; (8) whether the defendant was told he was free to leave; (9) whether the defendant was told he was under arrest; and (10) the language used by officers." *Id.* ¶ 59. No single factor

is dispositive and courts consider all of the circumstances surrounding an individual's detention. *Washington*, 363 Ill. App. 3d at 24.

¶ 51    Soto claims that he was illegally detained after the police confronted him about pointing out the wrong addresses and the discrepancy between his story and El Moro's regarding their whereabouts on October 3 because, at that point, a reasonable person would not have felt free to leave. Soto also argues the police illegally seized him because he was (1) isolated from the public in an interview room for more than 48 hours; (2) transported to and from the station in the back of police vehicles; (3) escorted by police to use the restroom; and (4) left to sleep on a metal bench in the interview room for two successive nights. Soto contends that the police investigated his involvement in the murder in search of probable cause while illegally detaining him at the police station.

¶ 52    But none of the facts that Soto points to transformed his admittedly voluntary presence at the police station into an illegal arrest. Based on the totality of the circumstances surrounding Soto's presence at the police station, it is evident that Soto's presence was voluntary and became a custodial arrest only after there was probable cause to suspect Soto murdered Colin following Detective Garcia's interview with Morales.

¶ 53    Under normal circumstances, we would likely infer that a person who slept two consecutive nights in a windowless room on a metal bench was detained. But that inference was rebutted here by the fact that Soto told police he was homeless, had no place else to go, considered the police station to be warm, and wanted to find out what happened to his friend. *People v. Anderson*, 395 Ill. App. 3d 241, 248 (2009) (spending a long time in an interview room does not conclusively establish that the authorities illegally detained a suspect). The detectives also fed Soto and gave him fresh clothes to wear while he was at the police station. Moreover,

any restriction of Soto's movements in the police station did not amount to an illegal seizure because the area outside of the interview room was considered a protected area due to the other ongoing investigations and Soto was not treated differently than any other member of the public.

¶ 54    Even though Soto remained in the interview room from October 4 to October 6 except when he left the station to assist in the investigation, the evidence in the record reveals that the door to the interview room was either open or, if closed, was unlocked. Notably, holding cells were located in the building, but the detectives did not place Soto in a cell at any time prior to his arrest. Likewise, there is no evidence in the record that, after Soto voluntarily accompanied the police officers to the station, he was (1) patted down, (2) handcuffed, (3) fingerprinted, (4) photographed, or (5) processed. *Id*. at 249. Indeed, when Soto voluntarily left the police station and accompanied the detectives to assist with the investigation, the detectives did not handcuff him, not even after the miscommunication regarding the wrong address for El Moro and the joint Soto and El Moro interrogation. Because Soto left the police station to assist the detectives with their investigation, his transportation in an unmarked police vehicle was reasonable and not an indication of a seizure. See *People v. Montgomery*, 302 Ill. App. 3d 1, 10 (1998) (police transporting an individual for questioning to the police station does not convert questioning into an arrest). Significantly, after Soto's arrest, he was no longer permitted to leave the police station to further assist in the investigation—not even in the company of police personnel—which further supports the conclusion that Soto was not detained prior to the Morales interview.

¶ 55    Not only were there no indicia of a formal arrest, but, importantly, two different detectives told Soto that he was free to leave. See *contra Washington*, 363 Ill. App. 3d at 23, and *People v. Young*, 206 Ill. App. 3d 789, 800 (1990) (police failed to advise the suspect that he or she was free to leave). Although Soto did not testify at the suppression hearing, there is no

indication in the record that he was no longer willing to cooperate with the police. *Anderson*, 395 Ill. App. 3d at 252. Soto's statements to the detectives that he wanted to find out what happened to his friend also contradict his claim that he was detained. The unrebutted fact that Soto arranged for his friend to call 911 to report Colin's death and waited at the gas station until the police arrived supports the conclusion that Soto indeed wanted to cooperate with the investigation if only in an effort to deflect attention from himself. In fact, Soto told Dr. Viale-Val both that he had lied to the police and that he wanted to find out what the police knew and how far they would go. Finally, given Dr. Jasinski's testimony that any alcohol withdrawal symptoms experienced by Soto were mild, this factor does not support a finding that Soto did not voluntarily remain at the station.

¶ 56       Soto bore the burden of demonstrating that his continued presence at the police station, including two overnight stays, constituted an illegal seizure. *Id*. at 251. Under the circumstances, Soto did not meet that burden because a reasonable person who voluntarily agreed to cooperate with police in the investigation and was repeatedly told he was free to leave would have believed that he was, in fact, free to leave and his continued cooperation remained a matter of his own volition. *Id*. at 255. Accordingly, Soto's fourth amendment rights were not violated because he (1) voluntarily remained at the police station and (2) was lawfully detained after the police had probable cause to arrest him following the interview with his cousin. Because Soto was not illegally detained, suppression of his statements given to the detectives during the course of their investigation on the basis that they were fruit of an illegal arrest was not warranted. See *People v. Lovejoy*, 235 Ill. 2d 97, 130 (2009) (evidence obtained as a result of an illegal arrest warrants suppression).

¶ 57    Soto next claims that the trial court should have suppressed his third incriminating statement because the detectives deliberately engaged in an illegal two-step "question first, warn later" interrogation tactic to elicit his incriminating statements. Soto also claims that the detectives failed to employ effective curative measures after advising Soto midstream of his *Miranda* rights and Soto was not told that his unwarned statements and previous confessions were inadmissible before questioning him further.

¶ 58    In the seminal case of *Missouri v. Seibert*, 542 U.S. 600, 617 (2004), the United States Supreme Court condemned the "question first, warn later" interrogation technique and mandated the suppression of statements that resulted from use of that tactic. Under the "question first, warn second" technique, an officer initially interrogates a suspect, obtains an incriminating statement, then provides the *Miranda* warnings, and repeats the question until the accused repeats the answer provided before the warnings. *Id*. at 606. The court reasoned that midstream *Miranda* warnings given after eliciting a confession would be ineffective in conveying to a defendant the nature of his rights, including the right to remain silent, and the consequences of abandoning those rights. *Id*. at 613-14. In his concurrence, Justice Kennedy advocated a narrower test finding the plurality's test was too broad because it applied to both intentional and unintentional two-step interrogations. *Id*. at 621-22 (Kennedy, J., concurring). In contrast, Justice Kennedy's test applied only in the infrequent cases where police deliberately employed a two-step interrogation in a calculated effort to undermine *Miranda* warnings. *Id*. at 622 (Kennedy, J., concurring).

¶ 59    In *People v. Lopez*, 229 Ill. 2d 322, 360 (2008), our supreme court adopted Justice Kennedy's concurrence in *Seibert* as controlling authority in Illinois. *Lopez* reiterated that the relevant framework is to first determine if the police deliberately engaged in a "question first, warn later" technique during their interrogation of a defendant. *Id*. If there is no evidence

supporting a finding of deliberate conduct, then the *Seibert* analysis ends. *Id*. On the other hand, if the evidence supports a finding of deliberateness, then a court must consider whether curative measures were taken before the accused made a postwarning statement. *Id*. at 360-61. Curative measures include a substantial break in time and circumstances between the unwarned statement and the postwarning statement to allow the accused to distinguish between the two contexts and alert the accused that the interrogation has taken a new turn. *Id*. at 361.

¶ 60    Importantly, the trial court found it ludicrous that the detectives did not consider Soto a suspect based on all of the information that the detectives had after the interview with Soto's cousin. The trial court believed that the detectives deliberately confronted Soto about lying, including lying about his name, to see what would happen, and then they would be able to investigate further based on Soto's response. The trial court's statements make it clear that it considered the detective's conduct in failing to immediately administer the *Miranda* warnings after the interview with Soto's cousin to be deliberate. The record supports the trial court's factual finding, given that by that time the detectives knew, in addition to the information they had already gathered, that Soto told his cousin that he beat somebody up. Accordingly, because the trial court's finding that the detectives deliberately engaged in a "question first, warn later" technique is supported by the evidence, we must consider whether curative measures were taken before Soto's third statement.

¶ 61    Here, adequate curative measures were taken before Soto's third incriminating statement. Specifically, more than 24 hours elapsed between Soto's tainted statements and his third statement, which was a sufficient period of time to disrupt any continuum between Soto's first two statements and his third. Also, Detective Cortez, who acted as the interpreter during ASA Gudino's questioning, was not present when Soto made his prior two incriminating statements,

which further attenuates this line of questioning from Soto's earlier statements. Moreover, unlike his prior two statements, Soto gave his third statement to an ASA and not to Detective Garcia. Although Detective Garcia was in the interrogation room when the ASA questioned Soto, Detective Garcia did not ask any questions. His mere presence in the same room was not enough to render Soto's third statement inadmissible based on a continuity of police personnel or environment. Similarly, Detective Garcia's correction and assistance with Soto's recollection of certain facts toward the end of ASA Gudino's questioning did not render the third interrogation inseparable from the first two interrogations. While Garcia's absence would have precluded any credible argument regarding the lack of attenuation, his presence, primarily as an observer, does not compel the opposite result.

¶ 62     In *Seibert*, after discussing the type of curative measures that could attenuate the link between unwarned and warned statements, Justice Kennedy observed, "[a]*lternatively*, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient." (Emphasis added.) *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring). Thus, under the narrower interpretation of *Seibert* adopted in Illinois, advice to the accursed regarding the "likely inadmissibility" of an earlier statement may be enough, even in the absence of other curative measures, to offset "ask first/warn later" misconduct.

¶ 63     We do not view the law as requiring *both* curative measures and advice to the accused as to the admissibility of earlier statements. We further observe that a requirement that the accused be given what is essentially legal advice regarding the admissibility of earlier statements is problematic where, as here, the later questioner was not present for and thus has no personal knowledge of the circumstances under which the prior statement was made. ASA Gudino would have gotten her information about Soto's initial statement from Detectives Garcia and Lara, who

-22-

were present when Soto first confessed. They likely would have told Gudino what they told the court during the suppression hearing, *i.e.*, that when they returned to the station after interviewing Soto's cousin, they did not believe they had probable cause to arrest Soto and so did not administer *Miranda* warnings.

¶ 64    In the midst of a criminal investigation, it is asking the impossible for someone in Gudino's position to assess facts of which she has no personal knowledge, predict how those facts will later be viewed by a trial judge, and give a criminal suspect what is essentially legal advice about the likelihood that his earlier statement may be used against him. The most that Gudino could have told Soto before his third statement was that there may be some issues regarding the admissibility of the earlier statement. The utility of such equivocal advice to inform a suspect's decision to give a further statement appears negligible. But Gudino would have run the risk of providing incorrect legal advice to Soto had she affirmatively represented to Soto that his earlier statements were inadmissible. Such advice, if later determined to be inaccurate, could have called into question the admissibility of Soto's third statement. See *People v. Melock*, 149 Ill. 2d 423, 450 (1992) (using deception to obtain a confession is a factor weighing against a finding that defendant's confession was voluntary); *People v. Ramirez*, 402 Ill. App. 3d 638, 642, 644 (2010) (counsel provided ineffective assistance by erroneously advising defendant that there was no meritorious basis to pursue suppressing incriminating statements). In any event, because we believe the facts here demonstrate sufficient curative measures between Soto's second and third statements, we view as unnecessary the alternative measure Justice Kennedy discussed in *Seibert*.

¶ 65    We also consider it significant that when Soto made further incriminating statements to the ASA, Soto had received *Miranda* warnings in Spanish twice and waived his rights both

times. After receiving the *Miranda* warnings, Soto had a genuine choice of whether to expand upon his prior two statements and he made the decision to provide additional details regarding Colin's death. *People v. Montgomery*, 375 Ill. App. 3d 1120, 1129 (2007); see *People v. Wilson*, 164 Ill. 2d 436, 452 (1994) (defendant who had been warned of his rights was free to decide whether to make additional statements).

¶ 66     In sum, because the curative measures taken between Soto's second and third incriminating statements—the substantial lapse in time and change in personnel—clearly conveyed that the third interrogation was not part of a continuum but a new and distinct phase of the investigation, the *Mirada* warnings given prior to his third interrogation presented Soto with a genuine choice of whether he should proceed with the interrogation and make additional statements. Consequently, the trial court properly determined that Soto's third incriminating statement was admissible.

¶ 67     Finally, Soto challenges the admissibility of his third incriminating statement, claiming that his significant cognitive deficits, "extremely low" IQ, and alcohol withdrawal symptoms prevented him from voluntarily, knowingly, and intelligently waving his *Miranda* rights, undermining the validity of his *Miranda* waiver. Soto also claims the trial court erred in relying on its own observations of Soto's capabilities during pretrial proceedings, approximately four years after the murder, which was neither an accurate measure of his capabilities at the time of his investigation nor reflective of his level of understanding of the *Miranda* warnings.

¶ 68     In order to be valid, *Miranda* rights must be waived voluntarily, knowingly, and intelligently. *People v. Braggs*, 209 Ill. 2d 492, 515 (2003). More specifically, a valid waiver occurs where an accused's decision to relinquish his rights is (1) voluntary and not the product of intimidation, coercion, or deception and (2) knowingly made with a full awareness of the nature

of the rights being waived and the resulting consequences of waiving those rights. *People v. Brown*, 2012 IL App (1st) 091940, ¶ 25. A defendant's statement to authorities should be suppressed unless he voluntarily, knowingly, and intelligently waived his *Miranda* rights. *Braggs*, 209 Ill. 2d at 514; *People v. Tuson*, 2016 IL App (3d) 130861, ¶ 22; *People v. Walker*, 2012 IL App (1st) 083655.

¶ 69    We also apply a bifurcated standard of review to a trial court's ruling on the issue of waiver. As to the factual finding that the waiver was knowing and intelligent, we apply a manifest weight of the evidence standard. *People v. Brown*, 2012 IL App (1st) 091940, ¶ 26. We review *de novo* the ultimate question of whether a defendant's waiver was voluntary. *In re G.O.*, 191 Ill. 2d 37, 50 (2000).

¶ 70    During the hearing on Soto's motion to suppress on fifth amendment grounds, Soto and the State offered conflicting expert testimony regarding Soto's ability to understand and waive his *Miranda* rights. Based on that testimony, in addition to the trial court's own interaction with Soto and its review of the videotapes, the trial court found that Soto voluntarily, knowingly, and intelligently waived his *Miranda* rights. Moreover, the trial court found no evidence of coercion or that Soto's mental state interfered with his rational intellect and free will so as to render his waiver involuntary.

¶ 71    Fundamentally, the trier of fact determines the credibility and weight to be given to expert testimony. *People v. Urdiales*, 225 Ill. 2d 354, 431 (2007). A fact finder is not obligated to accept defendant's expert witnesses' opinions over the opinions offered by the State's experts. *Id.* Here, the trial court found the State's expert witnesses more credible, a finding supported by the evidence in the record. Although Dr. Viale-Val opined that Soto was incapable of knowingly and intelligently waiving his *Miranda* rights, that opinion was based primarily on observed

cognitive deficits resulting from alcohol withdrawal and assessed symptoms that included DTs and hallucinations. But in evaluating the expert testimony, the trial court found more credible the State's witnesses who opined that Soto did not manifest any symptoms of hallucinations or DTs at the time of his interrogation because Soto would have been incapable of suppressing those symptoms in the detectives' presence. Likewise, the State's expert witnesses testified that DT symptoms are not subtle and, had Soto been suffering from DTs, the symptoms would have been obvious to the doctors based on Soto's behavior during the videotaped statements. The trial court also found that there was no proof, contrary to Soto's experts' testimony, that Soto suffered from neurocysticerosis. The trial court further discredited Soto's expert's opinion that Soto only appeared to understand the *Miranda* warnings because he learned the language of the warnings and assimilated it into rote memory following his arrest. It is undisputed that Soto had some level of alcohol dependency, but the trial court's finding that Soto's waiver of his *Miranda* rights was not affected by symptoms of alcohol deprivation is not against the manifest weight of the evidence.

¶ 72     In concluding that Soto's *Miranda* waiver was valid, the record is clear that the trial court considered the totality of circumstances, including Soto's background, experience, and conduct. *Braggs*, 209 Ill. 2d at 514. Although Soto's diminished mental capacity was one relevant factor to consider, a court considers that factor in conjunction with other factors and circumstances. *Id.*; *People v. Goins*, 2013 IL App (1st) 113201, ¶ 50. Despite Soto's low IQ, the trial court noted that Soto worked, sustained himself, and supported his "habits." Indeed, the trial court had no doubt about Soto's "comprehension of the full panoply of *Miranda* rights and the potential consequences of the decision to relinquish them." Importantly, a defendant must have the ability

to understand the words comprising the warnings, but need not have the ability to understand the far-reaching legal and strategic effects of waiving his rights. *Id*.

¶ 73     We too have reviewed the videotapes of Soto's time in custody following his first incriminating statement. Soto can be observed, in no apparent physical distress, sleeping for long stretches of time, sitting calmly on the bench or one of the chairs in the room while awake, and responding coherently to the detectives' and later, ASA Gudino's questions. Thus, Soto's contention that his condition at the time of his incriminating statement did not enable him to validly waive his *Miranda* rights must fail.

¶ 74     Soto also claims that the trial court erroneously relied on its own observations of Soto's behavior during pretrial proceedings, years after his arrest. But the trial court explained that its observations were consistent with the experts' opinions, and the trial court, as did the experts, observed Soto's behavior in the recorded statements. Based on the record before us, the trial court's finding that Soto's *Miranda* waiver was knowingly and intelligently made is not contrary to the manifest weight of the evidence, and the court's ultimate conclusion that Soto's waiver was voluntary is likewise correct. Because Soto's *Miranda* waiver was valid, his third incriminating statement was properly admitted into evidence.

¶ 75     Affirmed.

¶ 76     PRESIDING JUSTICE HYMAN, dissenting in part:

¶ 77     I agree with my colleagues that Soto was not illegally detained, that he was capable of waiving his Miranda rights, and that his first two statements were rightly suppressed by the trial court. But Soto's third statement, obtained after police used the impermissible "question first, warn later" technique, also should have been suppressed because the police did not take adequate

measures to cure this violation of Soto's constitutional rights. Therefore, I dissent from that portion of the majority opinion.

¶ 78    The majority rightly concludes that the police used a deliberate "ask first, warn later" technique as described in *Seibert*. We part ways at the next step of the analysis: whether the police took enough curative measures between the second and third statements so that Soto would be able " 'to distinguish the two contexts and appreciate that the interrogation has taken a new turn.' " *Lopez*, 229 Ill. 2d at 360-61 (quoting *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring)). The curative measures "should be designed to ensure that a reasonable person in the suspect's situation *would understand the import and effect* of the *Miranda* warning and the *Miranda* waiver." (Emphasis added.) *Seibert*¸ 542 U.S. at 622 (Kennedy, J., concurring).

¶ 79    *Seibert* suggests several factors in assessing whether the violation has been cured: (1) the passage of time between the two statements, (2) the location, (3) whether the same law enforcement officer questioned the defendant in both statements, (4) whether details obtained during the "unwarned" interrogation were also used in the subsequent "warned" statement, and (5) whether the police advised the suspect that the earlier statement was inadmissible. 542 U.S. at 616. The question comes to this: Would a reasonable suspect have considered the "unwarned" and "warned" interviews to be "parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before." *Id.* at 616-17.

¶ 80    The majority identifies two curative measures: the 24-hour time lapse between the second and third statements, and that the questioner in the third statement was ASA Gudino, not Detective Garcia. Further, the majority states that, because Soto was Mirandized before giving the third statement, the police "presented Soto with a genuine choice of whether he should

proceed with the interrogation and make additional statements," so it did not matter that no one told Soto his first and second statements would be inadmissible.

¶ 81     The 24-hour break between the second and third statements at first glance weighs in favor of admissibility. See *People v. Hannah*, 2013 IL App (1st) 111660, ¶ 49 (break of almost three hours between pre-*Miranda* questioning and subsequent statement was curative). But *Seibert* speaks of a change in "time *and* circumstances" between the statements (emphasis added) 542 U.S. at 622 (Kennedy, J., concurring)). Here, the circumstances did not change, so the passage of time is of no consequence.

¶ 82     According to Detective Garcia, Soto gave his first statement in Interview Room E; Garcia then took Soto into Interview Room A for the second statement (because the recording equipment in Room A was better). After this second statement, Soto apparently spent the night in Room A and gave his third statement in Room A. Soto's physical environment itself did not change at all between the second and third statements. Unlike the defendant in *Hannah*, who was transported to the police station between the unwarned and warned statements**,** there was no change in Soto's physical location that would signal to a reasonable person that "the investigation had taken a new turn." (Internal quotation marks omitted.) 2013 IL App (1st) 111660, ¶ 49; see also *Bobby v. Dixon*, 565 U.S. ___, ___, 132 S. Ct. 26, 32 (2011) (*per curiam*) ("[t]hings had changed" between unwarned and warned interrogations where defendant had time to travel from police station to jail and back again, speak to lawyer, and learn that police were talking to accomplice and had found victim's body).

¶ 83     This continuity of location counteracts the curative nature of the 24-hour lapse. Both our supreme court and other appellate courts have recognized the role and relevance of this factor. See *Lopez*, 229 Ill. 2d at 366 (use of same interview room for subsequent statement weighs

against admissibility); *People v. Little*, 2016 IL App (3d) 140124, ¶ 57 (defendant "did not leave the police station and remained in custody at all times" after unwarned statement); *People v. Alfaro*, 386 Ill. App. 3d 271, 306 (2008) (defendant remained in same interview room during all questioning and statements); *People v. Griffin*, 385 Ill. App. 3d 202, 205 (2008) (all interviews took place in police interrogation room); *People v. Montgomery*, 375 Ill. App. 3d 1120, 1129, 1130 (2007) (all questioning took place in same room, so there was no "meaningful change in circumstances that might constitute a curative measure").

¶ 84    The majority's reliance on the identity of the questioner is flawed as well. Review of the transcript and videotapes reveals that, while ASA Gudino was asking the questions during Soto's third statement, Detective Garcia was there in the interview room during the entire statement. Indeed, Gudino began the interrogation by reminding Soto that he had previously spoken to Detective Garcia. Detective Garcia also jumped in at the end of the interview (at Gudino's invitation) to guide Gudino's questions about other details that had been revealed during the initial statements. The presence of Detective Cortez (who translated for Gudino) did not counteract the inhibiting effect of Garcia's presence. In this way, the third statement was little different than the second; Gudino and Cortez had been added, but of utmost significance, Garcia remained, his very presence in the small interrogation room an unmistakable reminder of all Soto's earlier interactions with Garcia.

¶ 85    Thus, the consistency of Detective Garcia's presence did not break the "continuum" between the second and third statements. Indeed, Garcia's participation in the third statement did the opposite of the contention of the majority: it made the third statement seem part and parcel of the second. Substituting the questioner does not sufficiently change the circumstances as long as the original questioner is in the room, as our supreme court held in *Lopez*, 229 Ill. 2d at 365-66

(holding confession inadmissible where police detective who had obtained first, unwarned confession was present in room during warned confession taken by prosecutor); see also *Alfaro*, 386 Ill. App. 3d at 305-06 (police detective who obtained unwarned confession was present while different officer took warned confession); *Montgomery*, 375 Ill. App. 3d at 1129-30 (same).

¶ 86        A reasonable person, knowing that Detective Garcia was in the room and closely monitoring his or her responses to Gudino, would not be able to appreciate that the investigation had taken "a new turn." In fact, a reasonable person would be more likely to simply repeat the statement already given before the warnings, knowing that Detective Garcia was already aware of the earlier statement's contents and had used details from the earlier statements to further question in the third statement. With Detective Garcia sitting a few feet away, a reasonable person would not feel free to retract his or her earlier statement or change details. Detective Garcia would not need to use any of the interrogation tactics we generally view as "coercive" to ensure that Soto would stick to the same story he had previously given. Garica's mere presence does this. In sum, Detective Garcia's attendance precluded "a new turn" from taking place, regardless of the presence of Gudino and Cortez.

¶ 87        The majority downplays the importance of the failure to tell Soto that his first and second statements would be inadmissible, and surmises that this would not be required as long as other curative measures were taken. Regardless of what the majority poses as other curative measures (which I submit were inadequate), our courts have insisted that the failure to take this curative measure weighs against admissibility. See *Lopez*, 229 Ill. 2d at 366; *Alfaro*, 386 Ill. App. 3d at 306; *Montgomery*, 375 Ill. App. 3d at 1130. The majority questions whether it would be reasonable for the prosecution team to have realized that the first two statements were

problematic, or wise for them to inform Soto that they were not admissible. Here, the State had 24 hours, and the assistance of at least two ASAs, to come to this determination before Soto's third statement. As for the wisdom of the action, I can only reiterate that *Seibert* advises them to do so. The State would have been no worse off had the prosecution team taken this step: the first two statements would still have been excluded. But had the police, or an ASA, informed Soto that his first two statements would not be used against him, then there would be some confidence that Soto made the third statement because he had a genuine choice—as opposed to cooperating because he felt he had no other option.

¶ 88       The majority concludes that the Miranda warnings themselves were sufficiently curative. That ASA Gudino repeated the Miranda warnings before the third statement made them less, not more, meaningful to a reasonable person. Soto had already been Mirandized before his second statement; if those warnings were to have any impact at all, it would have been then. Repetition without explanation merely uses the warnings in a rote manner and does not distinguish between the second and third statements, such that a reasonable person would think the warnings were more important the second time around.

¶ 89       I therefore disagree that a reasonable person would think they had a "genuine choice" to participate in the third statement.

¶ 90       A *Seibert* violation is disturbing enough in the abstract, when it happens to the paradigmatic "reasonable person." Even more so here. Raul Soto was particularly vulnerable to this type of police manipulation. Soto was a homeless, illiterate, chronic alcoholic who did not speak English (leaving him open to possible mistranslation by the police interpreter, or run-of-the-mill misunderstandings) and was apparently on bad terms with his family. He was singularly

incapable of protecting himself from *Seibert*-style misconduct, and no one was looking out for him either.

¶ 91        As explained, the test is whether a "reasonable person" would have thought he or she had a choice whether to make the third statement. Soto is no one's idea of a reasonable person; even if he had been, the third statement should have been suppressed because the curative measures were deficient.